In re HIGH FRUCTOSE CORN SYRUP ANTITRUST LITIGATION.

This Document Relates to All Actions.

MDL No. 1087.

United States District Court, C.D. Illinois, Peoria Division.

Aug. 23, 2001.

Michael J. Freed, Much Shelist Freed Denenberg Ament Bell & Rubenstein, P.C., Chicago, IL, Robert N. Kaplan, Kaplan, Kilsheimer & Fox, LLP, New York City, H. Laddie Montague, Jr., Berger & Montague, P.C., Philadelphia, PA, for Class Plaintiffs.

Brian Posewitz, Tonkon Torp, LLP, Portland, OR, for Plaintiff Gray & Co.

Mark W. Ryan, Mr. Richard J. Favretto, Mayer, Brown & Platt, Washington, DC, for Defendant Cargill, Inc.

Aubrey M. Daniel, III, Mr. Steven R. Kuney, Williams & Connolly, Washington, DC, for Defendant Archer Daniels Midland Co.

Terry M. Grimm, Mr. Joseph Spiegler, Winston & Strawn, Chicago, IL, for Defendant A.E. Staley Manufacturing Co.

Donald R. Harris, Edward F. Malone, Jenner & Block, LLC, Chicago, IL, for Defendant American Maize–Products Co.

### ORDER

MIHM, Chief Judge.

This matter is now before the Court on various motions for summary judgment by Defendants. For the reasons set forth below, Cargill's Motion for Summary Judgment [# 630] is GRANTED; A.E. Staley's ("Staley") Motion for Summary Judgment [# 632] is GRANTED; American Maize's Motion for Summary Judgment [# 650] is GRANTED; and Archer Daniels Midland's ("ADM") Motion for Summary Judgment [# 652] is GRANTED.

### BACKGROUND

I. *The Parties*

Plaintiffs are a consolidated class consisting of all U.S. purchasers of high fructose corn syrup ("HFCS") who purchased this product directly from any Defendant at any time during the period from July 21, 1991, through June 30, 1995.[1] Exclud-

---

1. This case initially began as a number of separate class actions from across the country that were then consolidated before this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. Following the re-

mand of a number of these cases for failure to satisfy the jurisdictional amount in controversy, 25 separate class actions plus *Gray & Co.*

ed from this class are governmental entities, Defendants, subsidiaries/affiliates of Defendants, other HFCS producers and their subsidiaries/affiliates, and those purchasers who have opted out of the class. Defendants ADM, Cargill, Staley, and American Maize are United States based manufacturers and sellers of HFCS.[2] The HFCS industry in the United States is highly concentrated and is an oligopoly.[3]

ADM produced HFCS at corn wet milling plants in Clinton and Cedar Rapids, Iowa, and Decatur, Illinois. Cargill's HFCS plants were located in Cedar Rapids and Eddyville, Iowa, Dayton, Ohio, Memphis, Tennessee, and Blair, Nebraska (after August 1995). Staley produced HFCS at corn wet milling plants in Decatur, Illinois, Lafayette, Indiana, and Loudon, Tennessee. American Maize produced HFCS at plants in Decatur, Alabama, and Dimmitt, Texas. CPC's HFCS production was done at plants in Argo, Illinois, Winston Salem, North Carolina, Stockton, California, Port Colborne, Ontario, London, Ontario, and Cardinal, Ontario. During the time period relevant to this litigation, ADM, Cargill, Staley, American Maize, and CPC accounted for an average of more than 90% of the production capacity for HFCS in the United States and Canada.

## II. The Product and Process

HFCS is produced from corn and is used as a sweetener in various applications. In the initial milling process, corn is separated into "starch slurry" and corn co-products, which include corn gluten feed, corn gluten meal, and corn oil. Starch slurry can then be used to make a variety of products including HFCS, ethanol, dextrose, crystalline fructose, potable alcohol, industrial starch, and regular corn syrup. To produce HFCS, enzymes are added to the starch slurry to convert it into dextrose syrup. It can be manufactured to have various sweetener characteristics, depending on the percentage of fructose in the blend. HFCS producers manufacture two primary types of the product, HFCS 42, which contains 42% fructose, and HFCS 55, which contains 55% fructose. To create HFCS 42, another enzyme is added to the dextrose syrup; the HFCS 42 can then be blended with syrup containing a higher percentage of fructose to create HFCS 55.

Both HFCS 42 and HFCS 55 are commodities in that their characteristics do not change from producer to producer. HFCS 42 is used as a sweetener in products such as soft drinks, canned goods, baking products, condiments, jams, dairy products, and alcoholic beverages and is purchased by a broad range of customers, including food processors, confectioners, bakers, dairy producers, canners, and soft drink manufacturers. HFCS 55 is primarily used in the soft drink industry as a substitute for sugar but is also used in canned goods, fountain syrups, confectionery products, baked goods, dairy products, and alcoholic beverages. Demand for HFCS is inelastic and cyclical because of seasonal changes in demand for products containing HFCS; demand peaks in the summer when sweetened beverage sales rise.

*v. ADM, et. al.,* a tag-along state case, remain before the Court.

**2.** CPC International, Inc. ("CPC"), a named Defendant in this action, settled with the class early in the litigation. Roquette America, Inc., Golden Technologies Company, Inc., and Minnesota Corn Processors were also United States producers of HFCS during the conspiracy period but were not named as Defendants in this action.

**3.** An oligopoly occurs when there is "[c]ontrol or domination of a market by a few large sellers, creating high prices and low output similar to those found in a monopoly." BLACK'S LAW DICTIONARY 1115 (7th Ed.1999).

There is very little substitutability between corn syrup and HFCS, and the end uses for corn syrup differ from the end uses for HFCS. Although sugar was formerly used by the soft drink industry as a sweetener, the industry has since shifted to HFCS, as functional differences in many applications make HFCS preferable to sugar.

### III. *The Industry*

Between 1988 and 1995, the industry's total HFCS output increased by 3.6 billion pounds. ADM increased its shipments by 13%, Cargill increased its shipments by 60%, Staley increased its shipments by 21%, American Maize increased its shipments by 37%, and CPC increased its shipments by 18%. HFCS producers also increased their HFCS finishing capacities;[4] ADM, American Maize, Cargill, CPC, and Staley increased their finishing capacities by 88.9%, 47.9%, 52.4%, 38.7%, and 33.2% respectively. During this same period, there were fluctuating market shares. Cargill's market share went from 20.8% in 1988 to 26.3% in 1991 to 25.6% in 1994. ADM's market share went from 30.6% in 1988 to 25.3% in 1991 to 26.6% in 1995. Staley's market share went from 22.3% in 1988 to 15.6% in 1992 to 19.5% in 1994. Furthermore, capacity increased by more than the increase in demand.

Each of the Defendants was a member of the Corn Refiners Association ("CRA"), a trade association for members of the corn refining industry, and each had been a member prior to 1988. The CRA stems from a predecessor organization that was founded in 1913 and has a professional staff of nine persons, including a President, a Vice President, and directors of congressional affairs, communications, and technical affairs. The CRA's activities are conducted through a Board of Directors and several committees. Between 1988 and 1995, the members of the CRA sent their monthly grind and shipment figures for HFCS and other products (such as corn syrup, starch, and dextrose) to the accounting firm of Ernst & Young ("E & Y"), which was retained by the CRA to gather members' statistical data. E & Y combined the individual producers' data and transmitted only the aggregate numbers to the individual producers. Only the independent accountants at E & Y saw individual company data; none of the CRA staff or representatives of the corn refiner members saw individual company data. Monthly shipment information was then provided by the CRA to the U.S. Department of Agriculture and the Federal Reserve.

Defendants regularly published list prices for HFCS before, during, and after the alleged conspiracy period. Competitors' price lists were obtained from customers and industry observers. However, many large customers nevertheless bargained individually with producers on multi-year volume contracts or tolling agreements in order to receive discounts off the published list prices. A tolling agreement is an arrangement where a customer purchases corn and pays the HFCS producer a processing fee to manufacture corn into HFCS, receiving a credit for sale of the coproducts produced during the process; the parties negotiate the processing fee, and the customer assumes the risk of gains or losses associated with fluctuations in corn and co-product prices. Tolling agreements accounted for significant sales during the alleged conspiracy period. De-

---

4. Finishing capacity must be distinguished from grind capacity. Grind capacity is a measure of the amount of corn a mill can process into starch slurry, which then can be used to make several corn-derived products. A mill's finishing capacity is its ability to convert starch slurry into finished products, among which are HFCS 42 and HFCS 55.

fendants also contend that these large customers changed HFCS suppliers in order to obtain lower prices. Contracts for the purchase of HFCS are typically negotiated in the fall for the following year.

## IV. *The Alleged Conspiracy*

In 1992, the Federal Bureau of Investigation ("FBI") began an undercover investigation of price fixing at ADM with the aid of Mark Whitacre ("Whitacre"), who was at that time the president of ADM's Bio–Products Division, the division which produced lysine.[5] Over the next two and a half years, Whitacre secretly made between 120 and 130 tapes of conversations and meetings in the lysine industry, none of which contained any recording of any employee of Cargill, Staley, CPC, or American Maize. The investigation culminated in an FBI raid on ADM's headquarters in June 1995. As a result of the investigation, ADM pled guilty to price fixing in the lysine industry, as well as the citric acid industry, and paid $100,000,000.00 in criminal fines; civil cases followed closely on the heels of the criminal proceedings. Additionally, three ADM executives, Michael Andreas ("Andreas"), Terry Wilson ("Wilson"), and Whitacre, were criminally prosecuted, convicted, and sentenced to prison. With the exception of ADM, none of the other Defendants involved in this case were implicated in either the lysine or citric acid conspiracies, and no indictments were returned with respect to HFCS.[6]

The Plaintiff class contends that beginning as early as 1988, Defendants, through their senior executives responsible for corn wet milling products, conspired to unlawfully fix prices in the HFCS industry in violation of § 1 of the Sherman Act. Like the conspiracies identified by the Department of Justice in the lysine and citric acid markets, the HFCS conspiracy was allegedly accomplished by these executives dictating prices to be quoted and charged to purchasers, limiting knowledge to a centralized core group of executives, negotiating inter-company purchases among themselves when required to balance volume discrepancies, attending CRA meetings to facilitate and conceal communications in furtherance of the conspiracy, and using the CRA to transmit information among the co-conspirators. The class also points to the fact that ADM owned 32% of American Maize's Class A stock and 27% of all outstanding shares, as well as the fact that it was the largest shareholder in Tate & Lyle, PLC, the parent company of Staley since 1988, as circumstances that promoted and furthered the conspiracy. The Plaintiff class argues that throughout the conspiracy period, Defendants' market shares were essentially stable, and substantial barriers prohibited other competitors from entering the HFCS market.

The Plaintiff class identifies certain pricing practices as circumstantial evidence of conspiratorial activity. Price announcements generally occurred within a few weeks after the CRA meetings, which Plaintiffs suggest were used as a cover for Defendants' secret price fixing conferences. Defendants also appear to have followed each others' lead with respect to HFCS pricing by offering similar list prices and utilizing the same pricing mechanisms, which shifted uniformly from time to time. Additionally, the Plaintiff class suggests that on several occasions, one or more of the Defendants refused to take

---

5. Lysine is an amino acid used to stimulate an animal's growth that can be added to animal feed during the manufacturing process.

6. Although Cargill was initially named as a defendant in the citric acid conspiracy, summary judgment was entered in its favor on January 23, 1998.

advantage of opportunities to acquire the customer of another Defendant.

### V. *This Litigation*

Following the consolidation of the individual class actions and the transfer of the Gray & Co. tag-along case to this Court, the class was certified, and a Consolidated Amended Class Action Complaint was filed on March 1, 1996. After years of extensive discovery, two major interlocutory appeals, and a substantial delay pending the release of tapes by the Department of Justice at the conclusion of its criminal grand jury investigations, the remaining Defendants have now moved for summary judgment. Plaintiffs have filed their response, and the Court entertained oral argument on June 21, 2001. The matter is now ready for resolution, and this Order follows.

### LEGAL STANDARD

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.,* 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson,* 106 S.Ct. at 2511.

"In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* 507 U.S. 584, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). Here, that means the evidence must be viewed through the prism of antitrust law.

### PRELIMINARY EVIDENTIARY RULINGS

In attempting to meet its burden on summary judgment, the Plaintiff class relies on two categories of evidence that are subject to objection; namely, statements derived from DOJ undercover tapes and FBI 302's (the "DOJ evidence") and the inferences to be drawn from the invocation of the Fifth Amendment by certain former ADM executives.

### I. DOJ TAPES

■ A substantial portion of the Plaintiff class' case is based on evidence derived from the undercover tapes made with the assistance of ADM's Mark Whitacre. Although these tapes contain extensive evidence of conspiratorial activity in the lysine and citric acid conspiracies, HFCS is mentioned only tangentially in a handful of the hundreds of hours of taped conversa-

tions. All of the taped statements were made out of court, and there were no statements by employees or agents of Cargill, Staley, or American Maize.

Defendants argue that since the tapes are out-of-court statements, they constitute inadmissible hearsay. Moreover, since the taped conversations contain no statements by any employees or agents of Cargill, Staley, or American Maize, they cannot be admitted as admissions against the interest of those Defendants.

Plaintiffs assert that the tapes are admissible under Rule 404(b) of the Federal Rules of Evidence, which provides for the admission of evidence of a party's other bad acts when introduced as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident...." Specifically, Plaintiffs contend that the DOJ tapes are probative of intent to conspire, motive, plan, and lack of mistake. While the Court agrees that the tapes could possibly be probative for these alternative purposes with respect to ADM, the same cannot be said for the remaining Defendants, who did not play any role in the recordings and are not even identified by name in any conversation.

In order for the tapes to be admissible against Cargill, Staley, and American Maize, they would have to be admitted as statements of a co-conspirator. Under Rule 801(d)(2)(E), out-of-court statements are not hearsay if they are offered against a party and are statements "by a co-conspirator of a party during the course and in furtherance of the conspiracy." The Seventh Circuit has identified three elements that must be established by a preponderance of the evidence in order to qualify for admission under 801(d)(2)(E):

> (1) the existence of a conspiracy; (2) that the person making the statement was involved in the conspiracy; and (3) that the statement was made "during

> the course and [in] furtherance of the conspiracy."

*Stagman v. Ryan,* 176 F.3d 986, 997 (7th Cir.1999), *citing Garlington v. O'Leary,* 879 F.2d 277, 280 (7th Cir.1989).

As set forth below, the Court finds that Plaintiffs have failed to adequately demonstrate the existence of the HFCS conspiracy alleged, much less the participation of any of the taped individuals in a HFCS conspiracy. Moreover, even assuming that a conspiracy had been adequately proven by a preponderance of the evidence, the nature of the conversations recorded cannot reasonably be said to have been statements made in furtherance of the conspiracy, as the conversations relate primarily to either lysine or citric acid and reference HFCS only in a sparse, tangential, and ambiguous manner. There is nothing contained in the tapes offered as evidence in this case which could reasonably be construed as "part of the information flow between conspirators intended to help each perform his role." *Garlington,* 879 F.2d at 283; *United States v. Godinez,* 110 F.3d 448 (7th Cir.1997). Accordingly, the Court finds that the evidence contained in the DOJ tapes is inadmissible against Cargill, Staley, and American Maize.

■ The Court now turns to the question of whether this evidence is admissible against ADM. Unlike the situation with the other Defendants, the DOJ tapes contain statements by ADM's employees and agents that implicate them in other antitrust conspiracies.

> When evaluating the admissibility of other acts under Rule 404(b), this court uses a four-prong test that incorporates the relevancy aspect of Rule 403:(1) the evidence of the other act must address a matter in issue other than the defendant's propensity to commit the crime charged; (2) the other act must be similar enough and close enough in time to

be relevant to the matter in issue; (3) the evidence of the other act must be sufficient for the jury to find that the defendant committed the other act; and (4) the other act must have probative value that is not substantially outweighed by the danger of unfair prejudice.

*United States v. Poole,* 207 F.3d 893, 897 (7th Cir.2000).

Here, the Court has already acknowledged that the tapes could address matters other than ADM's propensity to violate the antitrust laws; namely, intent, motive, plan, and absence of mistake. The questions of whether the other act is similar enough to be relevant and whether any probative value is substantially outweighed by the danger of unfair prejudice are much closer questions, as the record reveals substantial differences between the way the lysine and citric acid conspiracies operated and the facts with respect to what happened in the HFCS industry.

Unlike the lysine and citric acid conspiracies, there is no direct evidence of wrongdoing in the record before the Court, and although the HFCS market was the alleged model for the other two conspiracies, the circumstantial evidence does not readily conform to the asserted pattern. In the lysine and citric acid conspiracies, ADM has admitted to having conspired with foreign companies; the HFCS conspiracy alleged involves only United States based manufacturers. In the other conspiracies,

trade associations were used as a cover for illegal meetings, with the sham trade association in the lysine industry even having been created expressly for that purpose. The lysine and citric acid conspirators used the same mechanisms for monitoring market share and compensating one another for exceeding the agreed-on shares. Monthly sales figures were forwarded to one of the conspirators, who then forwarded each member's information to the other conspirators so that each could monitor the market shares of the other conspirators and determine what corrective action needed to be taken at the end of the year. There was no such mechanism in the HFCS industry.[7] The other conspiracies also had very precise specifications and mechanisms in place to balance any discrepancies between the agreed-upon volumes and actual volumes which are not present in this case.[8] On the other hand, some of the same ADM individuals who were involved in those cases are also alleged to have been involved in this case; namely, Andreas and Wilson. The conduct occurred at roughly the same time as the conspiracy alleged in this case and involved similar allegations of price fixing and volume allocation.

Where evidence is admitted to show knowledge, intent, motive, or plan, "the prior acts need not be duplicates of the one for which the defendant[s are] now being tried;" the similarity requirement is met when prior acts share common characteris-

---

**7.** Plaintiffs have suggested that this information could have been filtered through the monthly reporting of information that was sent through the CRA. As set forth more fully below, this assertion is not supported by the record, which reveals that only an independent accounting firm ever saw the individual data; Defendants received only aggregate data and could not have monitored each others' market shares with this information. Additionally, there were other non-Defendant members of the CRA whose information

would also have been included in these aggregate figures.

**8.** As set forth more fully below, the handful of transactions which Plaintiffs claim were to "balance the deal" would have been woefully inadequate and cannot readily be reconciled with the market share data. The inter-Defendant sales identified were not of sufficient magnitude to remedy the losses of market share suffered.

tics that relate to the purpose for which the evidence is offered. *United States v. Long,* 86 F.3d 81, 84–85 (7th Cir.1996). Although there are substantial differences between the conduct alleged in the lysine and citric acid cases and the facts of record in this case, the Court nevertheless finds by the barest of margins that the other acts evidence is sufficiently similar to have some relevance under the second prong of the test set forth in *Poole.*

That being said, the 404(b) evidence must still have probative value that is not outweighed by the danger of unfair prejudice. Such evidence has been found to be unfairly prejudicial where the admission of the evidence "invokes horror or emotional responses" or "makes it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented. . . ." *United States v. Adames,* 56 F.3d 737, 742 (7th Cir.1995); *Young v. Rabideau,* 821 F.2d 373, 377 (7th Cir.1987). While all bad acts evidence is to some degree prejudicial, and there is some danger that this evidence could be considered as demonstrating ADM's propensity to fix prices and the probative value of such evidence is far from compelling, the Court cannot find that the danger of unfair prejudice outweighs the probative value and declines to impose the blanket exclusion sought by ADM.

## II. FBI 302's

■ Defendants move to exclude as hearsay the report forms on which the FBI agents have summarized statements made by witnesses during the course of the investigation, specifically summaries of interviews with Whitacre while he was co-operating with the investigation of ADM. In their brief, Plaintiffs only appear to seek the admission of one FBI 302 report that purports to document a statement given by Whitacre on September 28, 1993,

which relates a conversation he participated in earlier that day.

The FBI 302 reports are clearly hearsay under Rule 801 of the Federal Rules of Evidence since they are out-of-court assertions and, contrary to Plaintiffs' argument, are in fact being offered for the truth of the matter asserted; the question is whether there is any applicable exception. Plaintiffs argue that the report is admissible as a present sense impression, which provides an exception for statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed.R.Evid. 803(1). While this may provide an exception for Whitacre's same-day relation of the conversation that he participated in on September 28, 1993, the report is actually triple hearsay, as it represents an agent's documentation of the statement by Whitacre recounting a comment that was purportedly made by Andreas. In instances of multiple hearsay, the proponent must provide an exception for every link in the hearsay chain.

Plaintiffs make reference to Andreas' alleged statement as an admission against interest. Assuming that Plaintiffs' proffered version of the Andreas comment is correct and that the original Andreas comment itself could qualify as an admission against interest, the final link (that is, the actual preparation of the written report some period of time later by the FBI agent) remains unsatisfied. It is worth noting that the 302 report is just that—a report, not an affidavit or a deposition. As Plaintiffs have failed to offer an exception for the last link in this hearsay chain, the report in question is inadmissible and will not be considered for purposes of this motion.

## III. FIFTH AMENDMENT INFERENCES

■ Plaintiffs argue that they are entitled to adverse inferences because Andreas, Wilson, and Barrie Cox ("Cox"), ADM's Vice President of its Food Additives Division, have invoked their Fifth Amendment rights and refused to answer questions during their depositions on advice of counsel. Generally, invoking the Fifth Amendment in a civil context permits an inference that the witness' testimony would be adverse to his interests. *Central States, Southeast and Southwest Areas Pension Fund v. Wintz Properties*, 155 F.3d 868, 872 (7th Cir.1998), *citing Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Such an inference may be drawn but does not necessarily need to be drawn. *Daniels v. Pipefitters' Association Local Union No. 597*, 983 F.2d 800, 802 (7th Cir.1993). Factors to consider include the nature of the relevant relationships, the degree of control of the party over the non-party witness, the compatibility of the interests of the party and non-party witness in the outcome of the litigation, and the role of the non-party witness in the litigation. *LiButti v. United States*, 107 F.3d 110, 123–24 (2d Cir. 1997).

Here, Plaintiffs argue that they are entitled to adverse inferences against all Defendants because three former employees of one corporate Defendant refused to answer substantive questions during their depositions; no employees of Cargill, CPC, American Maize, or Staley invoked the Fifth Amendment in their depositions. Although they are correct in the assertion that a non-party witness' invocation of the right not to testify is admissible and may result in the drawing of an adverse inference under certain appropriate circumstances, the Court finds that this case does not present such appropriate circumstances.

During their depositions, Andreas, Wilson, and Cox repeatedly invoked their Fifth Amendment right against self-incrimination for every question asked. "Once a [witness] invokes the Fifth Amendment for any question, it is [his] right to invoke it for all questions." *In re Citric Acid Litigation*, 996 F.Supp. 951, 961 (N.D.Cal.1998). Under these circumstances, it is "impossible to draw a negative inference from his refusal to answer any given question, as it would be if his assertion of the privilege had been selective." *Ullman–Briggs, Inc. v. Salton/Maxim Housewares, Inc.*, 1996 WL 535083, at *17 (N.D.Ill.1996), *citing Brinks, Inc. v. City of New York*, 717 F.2d 700, 716 (2nd Cir.1983). In reaching this conclusion in *Ullman Briggs*, the court noted:

> Once it became apparent to [the] questioner that he would invoke the fifth amendment privilege with respect to any question whatsoever, counsel would then be able to fashion questions in such a way as to be able to create the most damaging testimony through negative inference, "safe from any contradiction by the witness no matter what the actual facts."

*Ullman–Briggs*, 1996 WL 535083, at *17.

That is precisely what would occur in this case if Plaintiffs were allowed to draw the inferences requested. Many of the questions were phrased in such a way that they could not be answered without subjecting the witnesses to the potential of further criminal liability. As such, the only trustworthy inference that can be drawn from these witnesses' invocation of their right to remain silent in response to these questions is that they were refusing to address whether they engaged in the conduct alleged in each question, particularly in light of the absence of other evidence in the record confirming Plaintiffs'

conspiracy theory as set forth more fully below.

Moreover, Plaintiffs want to assert these adverse inferences against not only the former corporate employer of these witnesses but also against the other named Defendants, which were completely separate corporate entities with no relationship to or control over these witnesses. The Court is unaware of any authority suggesting that this drastic extension of the concept would be appropriate, and Plaintiffs have not otherwise cited any precedent to this effect.

Under the circumstances and evidence present in this case, the Court concludes that no trustworthy inference of conspiratorial conduct can fairly be drawn from the depositions of Andreas, Wilson, and Cox without resorting to bald speculation or conjecture. *See LiButti,* 107 F.3d at 124 ("finding that the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth.")

## DISCUSSION

Section 1 of the Sherman Act prohibits "conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. A civil plaintiff asserting a Section 1 claim must establish: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993).

■ The Plaintiff class can establish a genuine issue of material fact by producing either direct evidence that Defendants conspired to fix prices in the HFCS industry or circumstantial evidence from which a reasonable fact finder could conclude that Defendants conspired. Direct evidence in this context is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litigation,* 166 F.3d 112, 118 (3rd Cir.1999). Plaintiffs set forth in their brief six examples of purportedly direct evidence: (1) an April 28, 1993 statement by Terry Wilson that, for secrecy, ADM should minimize the number of expense reports created and should not show the true nature of the meeting or the people involved; (2) a September 23, 1993, statement by Michael "Mick" Andreas to the effect of, "What are you gonna tell Keough, that we gotta deal with two, our two biggest competitors to f——ya over"; (3) a March 1992 statement by Staley's plant director of operations that, "We have an understanding within the industry not to undercut each others' prices"; (4) a statement by a Staley salesman that Staley could not quote a price because his boss was at an industry meeting and the pricing would not be determined until after his boss returned from that meeting; (5) a statement by Mick Andreas in October 1993 that a then director of Staley's parent company had made a statement to a member of the lysine conspiracy that "every business I'm in is an organization"; and (6) a handwritten Cargill document stating, "entry of new entrants (barriers) and will they play by the rules (discipline)."

Plaintiffs apparently saw the weakness of their assertion that any of these constitutes direct evidence and effectively abandoned any such position during the oral argument in this case. This was a wise decision, as the Court has reviewed the examples of supposed direct evidence and finds that each of the six examples purportedly indicating that Defendants participated in a HFCS price fixing conspiracy would also require that a substantial inference be drawn in order to have evidentiary significance. Accordingly, the Plaintiff class must attempt to make its proof through circumstantial evidence.

■ In *Matsushita Electrical Industrial Co. v. Zenith Radio Corporation,* the Supreme Court set forth an antitrust plaintiff's burden in resisting a summary judgment motion. 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although the Court must generally draw any reasonable inferences from underlying facts in the light most favorable to the non-moving party, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case" in that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 587–88, 106 S.Ct. 1348. In order to survive a motion for summary judgment, a plaintiff must "present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* at 588, 106 S.Ct. 1348. In other words, a plaintiff relying on circumstantial evidence "must show that the inference of conspiracy is reasonable in light of the competing inference of independent action." *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 599 (7th Cir.1995), *citing Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348.

The Seventh Circuit subsequently elaborated on the teachings of *Matsushita* and developed a three-part methodology for addressing antitrust conspiracy claims on summary judgment.

We first review the evidence of conspiracy submitted by the plaintiff. Next, we examine whether the defendants have offered evidence that tends to show that the conduct which forms the basis of the plaintiff's complaint is as compatible with the legitimate business activities of the defendant as it is with illegal conspiracy. Finally, if we determine that this analysis leaves the evidence of the conspiracy ambiguous, we determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests.[9]

*Serfecz,* 67 F.3d at 599, *citing Market Force, Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1171–72 (7th Cir.1990). In 1999, the Seventh Circuit essentially reaffirmed this standard in *In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d 781, 787 (7th Cir.1999), in which the court acknowledged that in a circumstantial evidence case, it was ultimately necessary for the plaintiff "to present economic evidence that would show that the hypothesis of collusive action was more plausible than that of individual action."

Plaintiffs contend that the test set forth in *Serfecz* is no longer applicable, citing to *Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). However, *Eastman Kodak* does not directly address the standard articulated in *Serfecz,* and the *Serfecz* case, which was decided three years after *Eastman Kodak,* is binding on this Court unless otherwise overruled or vacated. In support of the assertion that the *Serfecz* standard has been vacated, Plaintiffs cite to two more recent Seventh Circuit cases, *JTC Petroleum Company v. Piasa Motor Fuels, Inc.,* 190 F.3d 775 (7th Cir.1999), and *Toys "R" Us, Inc. v. Federal Trade Commission,* 221 F.3d 928 (7th Cir.2000).

In *JTC,* the plaintiff sued road contractor applicators and producers of emulsified asphalt in southern Illinois, alleging violations of Sections 1 and 2 of the Sherman Act in the road repair business. 190 F.3d at 776. When construing the record in the light most favorable to the plaintiff, the court found that the plaintiff had present-

---

**9.** In some circuits, this additional evidence is referred to as a "plus factor". *See Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1242–44 (3rd Cir.1993); *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1456 (11th Cir.1991).

ed both direct and circumstantial evidence that the road contractor applicators had agreed not to compete with one another in bidding local government contracts and also that the asphalt producers had agreed among themselves not to compete to survive summary judgment. *Id.* at 777. The Seventh Circuit noted that conflicts with respect to disputed evidence must await resolution at trial but did not appear to find the evidence of conspiracy to be ambiguous or otherwise attempt to provide guidance with respect to what inferences could permissibly be drawn. *Id.* at 778–79. Thus, it would not appear that the decision in *JTC* is inconsistent with the standard articulated in *Serfecz,* and in fact, the opinion in *JTC* expressly cites and relies on *Market Force,* which forms the basis for the standard in *Serfecz.*

*Toys "R" Us* was in an entirely different posture from the present situation. The Federal Trade Commission ("FTC") conducted an antitrust investigation into an alleged boycott in the retail toy market and found both vertical and horizontal restraints on trade; the case was presented on appeal from the FTC's administrative decision and remedy. *Toys "R" Us,* 221 F.3d at 930. The Seventh Circuit again cited to *Matsushita* for the proposition that an antitrust plaintiff relying on circumstantial evidence must show some evidence that " 'tends to exclude the possibility' that the alleged conspirators acted independently" or "which, if believed, would support a finding of concerted behavior." *Id.* at 934–35. As the FTC was able to present direct evidence, and the court's function on appeal was to review the administrative record under a substantial evidence standard, there was no detailed discussion of what inferences may permissibly be drawn from the facts or how to handle ambiguous evidence.

*Id.* Accordingly, the Court finds that this case adds little weight in support of the Plaintiff class' suggestion that *Serfecz* and *Market Force* are no longer good law in this circuit.

*JTC* and *Toys "R" Us* both involved cases that were at least in part based on direct evidence, which is a significant distinction from the purely circumstantial case now before the Court.[10] It was therefore unnecessary for the court to address the questions of permissible inferences and ambiguous evidence. In fact, the analysis in both of these cases arguably ended after the second step of the *Serfecz/Market Force* analysis with a finding that the evidence of conspiracy was not ambiguous, which would make *JTC* and *Toys "R" Us* consistent with prior law in the circuit. As such, the Court finds it unlikely that the Seventh Circuit would have used these cases as a vehicle to vacate or overrule *sub silentio* its prior detailed decisions with respect to how a district court should address purely circumstantial evidence of antitrust conspiracy on summary judgment.

This interpretation is also consistent with the law in other circuits. For example, in addressing the citric acid conspiracy, the Ninth Circuit outlined a two-part test. *In re Citric Acid Litigation,* 191 F.3d 1090, 1094 (9th Cir.1999).

> First, the defendant can "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior.

*Id.* Although the Ninth Circuit phrased its test somewhat differently from the Sev-

---

**10.** It would appear from the factual recitation in these cases that there was also a qualitative difference in the circumstantial evidence presented.

enth Circuit's statement in *Serfecz*, the difference is one without substance, as the essence of the standard is the same as that articulated in *Serfecz* and *Market Force*. *See also, In re Baby Food Antitrust Litigation*, 166 F.3d at 121–23; *Blomkest Fertilizer, Inc. v. Potash Corporation of Saskatchewan*, 203 F.3d 1028, 1032–33 (8th Cir.2000); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 569–71 (11th Cir.1998).

The Plaintiff class has described the alleged conspiracy as involving the following conduct:

> [R]each agreements to fix prices and allocate volumes at meetings held under the cover of an industry trade association and monitor and enforce the agreements through monthly reporting of sales so that companies getting out of line can adjust as they go along and, if necessary, be compensated at the end of the year through inter-defendant purchases.

(Class Plaintiffs' Corrected Consolidated Opposition at 77.) They note that these same fundamental elements also characterize the lysine and citric acid conspiracies and that the HFCS conspiracy was used as an example in structuring the lysine agreement. *Id.*

In attempting to meet their burden of proof, the Plaintiff class relies on both conduct and economic evidence. Although some of the record may be discussed piecemeal, the Court is nevertheless mindful of its obligation to weigh the evidence as a whole in that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Company v. Union Carbide and Carbon*

*Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

## I. CONDUCT EVIDENCE

There are numerous examples of purported conduct evidence identified by Plaintiffs. In March 1988, ADM announced that HFCS 42 would be priced at 90% of HFCS 55 prices (the "90% rule"), and all other Defendants quickly followed suit. In September 1988, Defendants publicly announced that they would price HFCS on a quarterly basis rather than through annual supply contracts; moreover, executives at ADM and Staley made statements prior to that announcement that Plaintiffs suggest indicate an awareness that the shift to quarterly pricing would, in fact, occur. Various high-level executives from each of the Defendant companies regularly attended meetings of the CRA, at which Plaintiffs assert that price fixing must have been discussed. These same executives had other opportunities for communication in furtherance of the conspiracy, such as phone calls and social dinners. Beginning in December 1988 and continuing through the alleged conspiracy period, Defendants regularly announced list prices that were nearly identical to each other.

In 1990, Cargill's share of the market increased, while ADM's and Staley's shares decreased; that same year, Cargill bought HFCS from ADM and Staley, which Plaintiffs suggest was to make amends for its increased market share.[11] In 1991, Cargill again increased its share of the market, while ADM's share went down, and Cargill purchased additional HFCS from ADM between March and June of that year.

---

11. During oral argument, the Court noted its concern that Plaintiffs appear to have "cherry-picked" a few transactions from the many transactions of record that they deem to be illustrative of their position.

In June 1991, Pepsi chose not to buy HFCS 55 from ADM; when Pepsi then tried to increase its supply from other producers, Staley refused to increase its sales to Pepsi despite excess capacity. In the fall of 1991, Pepsi asked Staley to reduce its prices for HFCS 55, and after failed negotiations, Staley refused to sell to Pepsi at all in 1992.[12] ADM then purchased HFCS from Staley in 1992 and 1993 and contributed money toward the building of a starch slurry pipeline between the Staley and ADM headquarters, both of which are located in Decatur, Illinois, which Plaintiffs suggest were compensation for Staley's loss of the Pepsi business. In 1995, Staley increased its market share and made purchases from ADM and Cargill to "balance the deal."

A growing spread between list prices and the actual transaction prices between 1989 and 1993 purportedly evidences "cheating" from the agreed-to prices by the conspirators. Plaintiffs then point to rebates that ADM and Cargill issued to some of their customers separate from their normal invoices as evidence of further "cheating" by ADM and Cargill.

In October 1993, Cargill announced that it would again offer annual pricing for HFCS, and the other Defendants followed suit shortly thereafter. Following a CRA meeting in November 1993, Defendants issued announcements withdrawing annual pricing and reinstating the quarterly pricing.

In 1994, price levels continued to increase, which Defendants attribute to the 1993 flood in the midwest. Plaintiffs argue that the price increase is actually indicative of a conspiratorial intent to increase margins, as there were few deviations from list price and no producer responded to a request from Pepsi to

obtain more volume in return for lower prices. Cargill also refused to quote prices for increased volume to Coca Cola and declined business from Heilemann. The Plaintiff class then points to statements by lower-level employees at ADM, Staley, Cargill, and American Maize that they were frustrated at not being able to effectively pursue new customers, as well as the perceptions of buyers in the industry that the suppliers were uniformly unwilling to reduce prices in exchange for increased volumes.

Finally, Plaintiffs point to what they deem to be barriers to entry into the market. In 1993 and 1994, Minnesota Corn Processors ("MCP") and Pro–Gold entered the HFCS market. ADM, Staley, CPC, and Cargill each tried to dissuade MCP from producing HFCS or entering into a joint venture agreement for its production/distribution. Similarly, ADM and Cargill made efforts to discourage Pro–Gold. Each category of the purported conduct evidence will be addressed in turn.

### A. *Parallel Pricing Decisions*

Plaintiffs cite to the 90% rule, the shift to quarterly pricing, the announcement of a return to annual pricing followed shortly thereafter by the recission of annual pricing, the regular announcement of list prices that were nearly identical to each other, and the circulation of price lists as evidence of collusive pricing. Defendants respond that the identified instances of pricing implicate only list prices, which were paid by a handful of small customers, while the majority of sales were actually made pursuant to individually-negotiated tolling agreements.

**12.** The record indicates, however, that Pepsi was able to obtain the HFCS 55 that Staley would have provided from its competitors, Cargill and American Maize.

### 1. 90% Rule

■ In 1987 and 1988, HFCS 42 list prices were less than 90% of HFCS 55 list prices and were decreasing relative to the HFCS 55 prices. On March 16, 1988, ADM announced that HFCS 42 would be priced at 90% of HFCS 55 prices. This announcement was then followed by similar announcements from CPC, American Maize, Cargill, and Staley on March 21, 1988, March 25, 1988, May 1988, and May 2, 1988, respectively. Plaintiffs point to acknowledgments by Robert Heard ("Heard"), ADM's Vice President of Sales and Marketing, and John Doxie ("Doxie"), Staley's Vice President of Sweetener Sales and Logistics, that if one of the HFCS producers had refused to adopt this pricing mechanism, then the rule could not have been implemented; they also note the statement by William Ducey ("Ducey"), Director of Sales for Maize Sweetener Group, that the 90% rule became an industry formula. However, these statements amount to nothing more than candid observations of the realities of an oligopolistic market and add nothing to Plaintiffs' side of the scale.

Plaintiffs then cite ADM Exhibit 325 as support for their contention that these pricing practices are evidence of collusion. This document is a June 1988 "Authorization for Expenditure" prepared by an ADM engineer seeking authorization for funds to debottleneck ADM's refinery in order to increase HFCS 42 capacity while still operating the HFCS 55 portion of the plant at full capacity "to keep pace with fructose industry growth." (Defendants' Joint Appendix, Ex. 60.) The document then states that, "[i]t is anticipated that the current practice of pricing [HF]CS 42 on an annual basis will not be offered in 1989 and [HF]CS 42 margins will realistically be equal to those realized on [HF]CS 55." *Id.* Defendants note that this document cannot reasonably be interpreted as indicating the certainty of future action that Plaintiffs suggest, particularly as the document was not prepared until nearly a month after Defendants had already published list price announcements showing the 90% ratio. Even when construed in the light most favorable to the Plaintiff class, the Court finds that the "Authorization for Expenditure" reveals nothing more than an anticipation of ADM's pricing decisions. It does not even mention an industry trend or any other producer, let alone suggest an agreement among the producers.

Plaintiffs then argue that the shift to 90% pricing for HFCS 42 made no economic sense because once ADM announced its increased pricing, the other producers could have undercut that price to gain additional HFCS 42 sales. However, Heard testified in his deposition that ADM shifted to the 90% ratio because HFCS 42 prices had dropped significantly below HFCS 55 prices, and some customers were beginning to switch to the less costly variety; ADM adopted the 90% rule to equalize its margins between the two products. (Heard Dep. at 149.) Staley and Cargill considered 90% to represent a fair estimate of the perceived relative sweetener levels. (Doxsie Dep. at 84; Cotter Dep. at 207–09.) William Ducey, American Maize's Director of Sales for its sweetener group, and Frederic Ash, its Vice President of Marketing and Sales, both stated that American Maize then simply followed the market. (Ducey Dep. at 76–77; Ash Dep. at 20.)

While Plaintiffs take issue with the technical accuracy of the various explanations offered by the Defendants for adopting the 90% rule, there is no evidence of communications regarding the move to a 90% ratio among the producers or any other evidence suggesting anything other than follow-the-leader pricing, let alone evidence

tending to exclude the possibility that the Defendants were pursuing their legitimate, independent interests by raising the price of HFCS 42 rather than lowering the price of HFCS 55 to equalize margins and maximize profits. The conduct identified by Plaintiffs in and of itself is simply an illustration of a follow-the-leader effort to maximize profit margins on HFCS 42, and there is nothing illegal about a seller's conscious choice to maximize profit margins on a product rather than dropping its prices to sell more volume. *See In re Potash Antitrust Litigation,* 954 F.Supp. 1334, 1363 (D.Minn.1997), *aff'd,* 203 F.3d 1028 (8th Cir.2000) (rejecting as "unfounded supposition" the suggestion that low cost producers could not rationally decide to sacrifice an opportunity to gain market share in favor of receiving higher product prices.)

2. Quarterly Pricing

█ Similarly, Plaintiffs have seized upon the shift to quarterly pricing, which proceeded along a similar pattern with ADM announcing its intent to price on a quarterly rather than annual basis and the other producers following suit thereafter, as evidence of collusion. They note the fact that customers opposed quarterly pricing, preferring the certainty of annual pricing, and that all producers had to make the shift in order for it to be successful, compelling the inference that the shift was the result of collusion.

Plaintiffs refer to the fact that there was a CRA meeting on June 7–8, 1988, and ask the Court to draw the inference that this was a cover for Defendants to reach an agreement to implement quarterly pricing. Similarly, the Plaintiff class argues that price fixing must have been discussed on June 19, 1988, when ADM's Terry Wilson and American Maize's Patric McLaughlin met for cocktails and/or dinner in Chicago, Illinois, and in June or July 1988, when ADM's Mick and Dwayne Andreas had dinner with Staley's Larry Cunningham at the Decatur Country Club. However, there is not one iota of evidence to confirm the bald speculation that an agreement was reached or even discussed on any of these occasions, and it is well established that mere opportunities to conspire are insufficient to support an inference of conspiracy, as they "do not tend to exclude the possibility of legitimate activity." *In re Citric Acid,* 191 F.3d at 1103; *In re Baby Food Antitrust Litigation,* 166 F.3d at 126 (finding that "communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise' "); *Blomkest,* 203 F.3d at 1033–34.

An October 1988 speech by Staley's Doxie is cited for the statement that he "expect[ed] HFCS to be offered for sale in 1989 on a quarterly basis at price levels that average well above 1988 levels." Plaintiffs then point to the portion of ADM Exhibit 325 which states, "It is anticipated that the current practice of pricing [HF]CS 42 on an annual basis will not be offered in 1989." They also note an August 17, 1988, draft operating plan for Staley which contained the comment, "We will announce and support efforts to limit corn syrup, 42% HFCS and 55% HFCS pricing to a quarterly basis." As the Court previously concluded with respect to the 90% rule, the statement in ADM Exhibit 325 reasonably reflects nothing more than an anticipation of ADM's pricing decisions. The same is true of Doxie's prediction of Staley pricing in his October 1988 speech, as well as the Staley operating plan, which is Staley's own internal policy and makes no reference to any other producer or industry policy.

In direct contrast to Plaintiffs' suggestion that Defendants switched to quarterly pricing as part of the conspiracy in late

1988, Defendants have offered uncontradicted evidence indicating that HFCS 55 was already being priced on a quarterly basis prior to the alleged conspiracy period. Specifically, they offer the following testimony: (1) Norbert Cremers, ADM's Vice President for Sweeteners, stated that ADM had used quarterly pricing long before and returned to that practice in the late '80s (Cremers Dep. at 127); (2) Gary Jordan, then Coca–Cola's Director of Purchasing, testified that he recalled quarterly price negotiations for HFCS during his employment in the early '80s (Jordan Dep. at 38); and (3) Clint Cutsforth of CPG and Wis–Pak recalled both annual and quarterly pricing mechanisms during his employment from the early '80s through 1990 (Cutsforth Dep. at 124). In fact, the use of quarterly pricing in the HFCS industry was recognized in a finding of fact in a 1991 court opinion involving ADM. *United States v. Archer–Daniels Midland Co.*, 781 F.Supp. 1400, 1419 (S.D.Iowa 1991). Such a practice would also have been in the producers' self-interest, as pricing over a shorter period of time lessens the seller's exposure to increases in the price of corn and offers the opportunity to hedge against fluctuations in corn price. Plaintiffs also fail to adequately refute Defendants' evidence demonstrating that despite the general switch to quarterly pricing, many individual purchasers nevertheless negotiated agreements for the purchase of HFCS priced on an annual or multi-year basis via tolling agreements or other contracts.

Additionally, Plaintiffs suggest that collusion is evident from the fact that Defendants announced in late October and early November 1993 that they would again formally offer annual pricing but rescinded their offers of annual pricing shortly after a November 12, 1993, CRA meeting. Again, the mere opportunity to conspire, without more, is insufficient to support an inference of conspiracy. Plaintiffs have offered no evidence indicating that pricing mechanisms were discussed at this meeting and fail to rebut Defendants' assertion that the rescission was due to a November 9, 1993, USDA report predicting the smallest corn harvest since the 1988 drought and the fact that the price of corn futures rose so precipitously on November 10, 1993, that the market's upper trading limits were triggered. In light of an uncertain corn harvest, it would have been in each Defendant's unilateral self-interest to minimize its exposure and risk by committing only to quarterly pricing contracts.

### 3. Substantially Similar List Prices

▮▮ In this case, it is undisputed that Defendants' price lists often contained similar or sometimes identical prices. Plaintiffs offer this as evidence of a conspiracy to fix prices. Defendants respond that Plaintiffs' reliance on list prices is misplaced because it ignores the realities of the HFCS industry, where large customers generally bargain individually with producers to receive discounts off list price and often enter into multi-year contracts or tolling agreements.[13] Representatives from Heinz and Ocean Spray testified that they have never paid list price for HFCS, while a representative from Pepsi stated that list prices were not part of his purchasing discussions with the producers. (James McDonough Dep. at 73; William Johnson Dep. at 22; Nicholas Guarino Dep. at 86.) Defendants have also submitted graphic evidence demonstrating that actual transaction prices for both HFCS 42

---

**13.** Between 1987 and 1996, approximately 16% of ADM's HFCS 55 sales were made pursuant to tolling agreements, while tolling agreements represented more than 45% of Cargill's sales and 11.3% of Staley's sales. For HFCS 42, tolling agreements comprised 4.6% of ADM's sales, 9.6% of Cargill's sales, and 9.5% of Staley's sales.

and HFCS 55 were widely varied throughout the alleged conspiracy period. (Defendants' Joint Appendix, Tab 115.) [14] Moreover, in a highly oligopolistic industry, the issuance of identical price lists is not sufficient to establish collusion. Hon. Richard A. Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 STANFORD LAW REVIEW 1562, 1581–82 (1969).

> The fact that a standard product is priced according to a standard formula does not indicate that a conspiracy exists; one manufacturer could have implemented the pricing systems, and its competitors could have decided independently to adopt it.

*Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992), *citing Market Force*, 906 F.2d at 1172; *United States v. Phelps Dodge Industries, Inc.*, 589 F.Supp. 1340, 1349 (S.D.N.Y.1984).

### 4. Circulation of Price Lists

Plaintiffs contend that the industry practice of publishing price lists in advance of their effective dates "insure[d] that each [producer] understood the prices the other manufacturers were using." Defendants respond that the announced price lists have no real relevance because the majority of purchasers did not pay list prices and that such prices could not be used to monitor pricing practices, as the abundant use of discounts, tolling agreements, and multiyear contracts renders list prices non-reflective of actual transaction prices. Defendants also note, without contradiction, that the publication of advance price lists and adoption of another competitor's announced pricing was common both before and after the period in which a conspiracy is alleged to have occurred.

The Supreme Court has consistently noted that "the dissemination of price information is not itself a per se violation of the Sherman Act." *United States v. Citizens and Southern National Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975), *citing Maple Flooring Manufacturers' Association v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); *United States v. Container Corporation of America*, 393 U.S. 333, 338, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). This circuit has further held that "the industry practice of maintaining price lists and announcing price increases in advance does not necessarily lead to an inference of price fixing." *Reserve Supply*, 971 F.2d at 53, *citing Market Force*, 906 F.2d at 1172. Like the market at issue in *Reserve Supply*, there is evidence in this record that the advance publication of price lists served some purpose other than to facilitate price fixing, as the record demonstrates that buyers in the HFCS industry found the advance publication to be useful to their purchasing practices. Nicholas Guarino, Manager/Director of Sweeteners for Pepsi, testified in his deposition that he looked at the advance price lists to see where Pepsi's price was relative to the list price and to get a sense of market trends. (Guarino Dep. at 86.) James McDonough, the Director of Procurement for Ocean Spray, used the lists to get a picture of where the industry was at any given time. (McDonough Dep. at 73.) Likewise, Heinz' Manager of Ingredients and Raw Products waited on the issuance of the fourth quarter price lists

---

14. Plaintiffs respond with the assertion that negotiated transaction prices would likely have been even lower if the list prices, which were the starting point for negotiations, had been set in a competitive market. However, this assertion first assumes the existence of artificially-inflated prices as a result of a conspiracy that the Court finds has not been adequately proven in this case and is therefore non-probative. Even assuming the validity of the suggested correlation between list prices and transaction prices, all that ·is shown is another instance of parallelism.

and used them as a starting point for negotiation. (Johnson Dep. at 22.) Even Plaintiffs' expert acknowledged his familiarity with the issuance of advance price information in various commodity industries and that there can be advantages to purchasers where price lists are announced in advance, as they provide a "sense of what one participant in the market believes the realized price will be at some future point in time ... [and] a point of bounds on the negotiations that will take place, or might take place between the buyer and a particular supplier or alternative suppliers." (Gordon Rausser Dep. at 291–92.)

Moreover, the record is simply devoid of evidence indicating that there was any defined plan for the exchange of price data among competitors or that any of the Defendants received another Defendant's pricing information prior to the public announcement of the price list. *See Container Corporation*, 393 U.S. at 333, 89 S.Ct. 510 (finding concerted action where there was an express agreement to exchange pricing information that could be analogized to a well-supervised and elaborate plan for the exchange of pricing data among competitors.) To the contrary, there is evidence indicating that Defendants received copies of price lists or quotes of a competitor's pricing from their customers or other industry groups after they had been publicly announced. Peter Boynton, Cargill's Western Regional Sales Manager, stated that he received competitors' pricing information through sales reps and customers themselves. (Boynton Dep. at 35.) American Maize's Vice President of Marketing and Sales testified that he received price lists from brokers, customers, distributors, and trade publications. (Ash Dep. at 15.) Other representatives gave similar testimony. (R. Kirk Weidner Dep. at 72; Vincent Macciocchi Dep. at 126–27; Joe Tkach Dep. at 44–45.) Permitting an inference of antitrust activi-

ty from these facts "would have the effect of deterring competitors from obtaining information about other companies' actual retail prices, even through legitimate means. We can think of few inferences that would have a more undesirable distorting effect on market conduct." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 906 F.2d 432, 455 (9th Cir.1990).

It is undisputed that the HFCS market is a highly concentrated market dominated by very few players, and it is well established that where a market is dominated by a few major players, parallel pricing is not uncommon and is generally insufficient to prove an antitrust conspiracy.

> Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). *See also, Market Force*, 906 F.2d at 1172 (finding that evidence that brokers were aware of other brokers' policies before enacting their own policies is "nothing more than a restatement of conscious parallelism"); *In re Citric Acid Litigation*, 191 F.3d at 1102 (finding parallel pricing or follow-the-leader pricing strategies insufficient to promote the inference of a Section 1 violation.)

The identified documents, even when construed in the context of other proffered evidence, are insufficient to support a reasonable inference of conspiracy. At best, the evidence suggests nothing more than conscious parallelism/follow-the-leader

pricing and does not tend to exclude the possibility that Defendants acted independently and legally in making their pricing decisions.

### B. *Inter–Firm Communications and Opportunities to Conspire*

#### 1. CRA Membership

■ Plaintiffs make much of the fact that various high-level representatives from the Defendant companies routinely attended the CRA meetings and place particular emphasis on the presence of Wilson and Andreas when they were not members of the specific committee or board that was meeting. Because these types of meetings were used as a cover in the lysine and citric acid industries, Plaintiffs reason that the CRA meetings must necessarily have been used for the same purpose here. Plaintiffs also suggest that certain sales information was filtered through the CRA as a means of monitoring the conduct of the various conspirators.

However, the trade association in this case is very different from that at issue in either the lysine or citric acid cases in several critical respects. The CRA had been established in the industry for more than 75 years prior to the start of the alleged conspiracy period, as opposed to the lysine association, which was formed expressly for purposes of transferring sensitive information and monitoring market shares in the price fixing scheme. It has a professional staff, a Board of Directors, and several member committees and is open not only to HFCS producers, but also to firms engaged in the production of corn starch, corn syrup, alcohol, and other products made through the corn wet milling process. The CRA also engages in lobbying activities, the preparation of scientific and technical materials for the industry, and public relations, all of which are traditional trade association functions.

Defendants have introduced evidence indicating that employees of the various CRA members who were not CRA directors frequently attended these meetings before, during, and after the alleged conspiracy, which minimizes any purported significance resulting from Andreas' or Wilson's attendance. There were at least three and possibly four CRA members who are not named as coconspirators in this case who were presumably present at these same meetings, submitted the same types of monthly production/shipment data for analysis, and received the same data in return. More importantly, the data submission process in this case was completely different from that in the other conspiracies. Unlike the citric acid and lysine conspiracies, where the co-conspirators secretly exchanged this data among themselves and received conspirator-specific data in return, the only evidence of record in this case is that CRA members submitted their individual data directly to independent accountants, received only aggregate information that was also submitted to governmental agencies for use in their statistical functions, and never saw another company's individual data.[15] (Ernest Micek Dep. at 187–88.) These facts strongly undermine any suggestion that the CRA and its reporting mechanisms were used for improper antitrust purposes.

Defendants have offered evidence from participants in the CRA activities indicating that price fixing was not discussed during these functions. Samuel Scott,

---

**15.** Plaintiffs argue that after receiving the aggregate data back from the accountants, each company could produce further calculations that would reveal its own market share. However, this would still not allow the companies to know their co-conspirators' individual information, and they would have no means of determining who was out of line and needed to either make a purchase or sell product to "balance the deal."

CPC's Vice President and President of Corn Refining, testified that he was never invited by another HFCS supplier to attend any informal meeting outside of the formal CRA meetings and was unaware of any such meetings having been held. (Scott Dep. at 53–54.) The President and CEO of American Maize stated that he did not discuss his company's business, pricing, or production with any of American Maize's competitors at the CRA meetings and never confirmed any prices that his company was charging its customers. (McLaughlin Dep. at 31–32.) Norbert Cremers, Vice President for Sweeteners of ADM, denied ever having heard from any source that anyone from ADM had communications related to pricing or customer allocation with representatives from any competitors at CRA conventions or meetings. (Cremers Dep. at 73.) John Doxie of Staley was unaware of any discussion relating to pricing that came from a CRA meeting of any sort. (Doxie Dep. at 24.) Richard Jurgenson, President of MCP (which is not a defendant in this case), was also present at CRA meetings and denied having participated in any conversations that ran afoul of antitrust laws or having any awareness of any price fixing agreement; he also confirmed the presence of lawyers during CRA meetings to remind participants of the antitrust laws. (Jurgenson Dep. at 279–80.) Furthermore, although the winter and summer price lists were sometimes issued shortly after CRA meetings, the spring and fall price lists were issued months after (or prior to, depending on which way you look at it) the May/June and November/December meetings.

Essentially all that has been shown is Defendants' membership in a trade association and participation in its activities. Plaintiffs have offered no specific details with regard to any purported price fixing discussions but, rather, urge the Court to draw the inference of conspiratorial activi-

ty from the mere opportunity to engage in such conduct. Membership in a trade association and participation in its activities, without something more, does not tend to exclude the possibility of legitimate, legal activity, and it is the "something more" that the Court finds to be utterly lacking in this case. *See Moore v. Boating Industry Associations,* 819 F.2d 693, 712 (7th Cir.1987) ("membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws .... There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member"); *In re Citric Acid,* 191 F.3d at 1103; *Maple Flooring,* 268 U.S. at 567, 45 S.Ct. 578 (transmittal of summarized statistical information which did not reveal the identity of any specific member to trade association members did not violate the Sherman Act.)

Nor does the DOJ evidence, admissible only against ADM, tip the balance. Plaintiffs cite to Wilson's attendance at lysine and citric acid meetings despite the fact that he had no direct responsibility for lysine and little knowledge of citric acid. They argue that the DOJ tapes reveal that he attended those meetings to teach and participate in price fixing and volume allocation based on his experience in HFCS. Contrary to the characterization suggested by Plaintiffs, the identified portions of the DOJ tapes all involve conversations about how to maintain a conspiracy in the lysine or citric acid markets and do not establish that Wilson gained his experience via a price fixing conspiracy in HFCS. The May 14, 1993, recording of Wilson, Whitacre, and members of the lysine conspiracy (Plaintiffs' Exhibit 4) contains a discussion of how individual data should be reported to one member of the conspiracy and cir-

culated outside of the trade association. Wilson expressly draws a distinction between this method of secret data exchange and that done through the trade association "where it could be official." When asked by another conspirator if the secret data exchange is how it is done in corn wet milling, Wilson replied, "No, we don't do that, we don't do that in corn wet milling," and goes on to say that corn wet milling is easier because he can guess what corn products are selling. At best, the recording identifies his experience in corn wet milling, which includes several products other than HFCS, such as corn syrup, corn starch, alcohol, and dextrose. Similarly, the November 23, 1993, December 1, 1993, and December 2–3, 1993, recordings consist of Whitacre (without Wilson being present) making vague references to foreign lysine or citric acid conspirators about Wilson's "experience" with the CRA, which also involves the other products associated with corn wet milling other than HFCS. The September 24 and 27, 1993, recordings indicate nothing more than Wilson's attendance at price fixing meetings in citric acid. The March 10, 1994, recording contains Wilson's often referenced statement that the buyer is not his friend, his competitors are his friends. While these recordings provide ample evidence of Wilson's involvement in price fixing in lysine and citric acid, they are far too vague to promote a reasonable inference that a conspiracy in HFCS served as the pattern for the other conspiracies.

### 2. Other Contacts

 Plaintiffs identify certain other contacts among various Defendants which they suggest represent "high level, interfirm communications" and opportunities to conspire. They point to communications between senior executives to arrange for inter-Defendant purchases of HFCS, meetings between ADM's Andreas and Ernest Micek ("Micek") of Cargill, calls from ADM's Wilson to other senior executives to verify prices quoted to customers, other intermittent meetings between senior executives, and inter-relations between Defendant companies.

Defendants have acknowledged that there were occasional meetings between Andreas and Micek as a result of the fact that the two companies supply each other with products other than HFCS. Micek's testimony offers legitimate, unrebutted business justifications for the contacts, such as a tolling arrangement for sunflower and canola seeds in Europe, the purchase of an interest in a Bulgarian plant, the heart attack/bypass surgery of ADM's Jim Randall, and an offer to swap grain elevators. (Micek Dep. at 35–38, 42–43.) Micek also denied having ever discussed pricing or specific HFCS customers with Andreas, and, in fact, stipulated that there would be no discussion about HFCS pricing, customers, or any other product line as a condition of his agreeing to participate in conversations with Andreas. (Micek Dep. at 189, 191.)

For the proposition that ADM's Wilson called other senior executives to confirm pricing, Plaintiffs cite to the deposition testimony of Robert Heard, ADM's Vice President of Sales and Marketing during the time in question. However, the testimony relied upon is actually prefaced by the statement that Heard did not have any personal knowledge one way or the other as to whether Wilson ever checked to verify prices with any competitor. (Heard Dep. at 67.) At best, the testimony reveals his uncertainty—that he may have heard from Larry Bohr ("Bohr"), ADM's Sales Administrative Manager/Marketing Manager for Sweeteners, or Norbert Cremers, ADM's Vice President for Sweeteners, at some time between 1988 and June 30, 1995, that they suspected that Wilson had verified prices. (Heard Dep.

at 67–68.) It was Heard's "impression" from these conversations that Bohr "believed" that Wilson had obtained competitors' prices for HFCS. (Heard Dep. at 70.) Bohr testified that he had overheard Wilson asking his assistant to get Cargill's Boynton, Staley's Doxie, and American Maize's McLaughlin on the line but was not personally present for any of these calls and did not hear any portion of any conversation that may have resulted from any call; Bohr also denied that Wilson had ever informed him personally of the substance of any calls to competitors. (Bohr Dep. at 69–70, 119–21.) Cremers testified that Wilson had informed him of his intention to verify a price on 10 to 20 occasions over the years and that the individuals whom he would contact would be Boynton, Doxie, and McLaughlin. (Cremers Dep. at 38–39.) Heard also stated that on occasion, Wilson would say, "I'll call Boynton," "I'll call Doxie," or "I'll call McLaughlin" but was unable to provide any information about whether such calls were in fact made or, if they were, what was discussed. (Heard Dep. at 84–85.) Julia Krall, a secretary in ADM's Corn Processing Division who apparently kept Wilson's rolodex, confirmed nothing more than that she recalled Wilson receiving a telephone call from Staley's John Doxie on one or two occasions. (Krall Dep. at 48–49.)

With respect to Heard's recollection of an incident involving customer Hunt Wesson in which he believed Wilson had checked pricing with Cargill, Heard stated that Cargill (presumably Boynton) had not responded to Wilson's inquiry, which undermines rather than supports the inference of antitrust activity. (Heard Dep. at 74.) This is consistent with Boynton's testimony that he refused to discuss prices with Wilson and never provided any pricing information. (Boynton Dep. at 228–29.) Heard discussed another incident in which he believed that Wilson had attempted to verify a price quote to Honick-man Group from Staley; he did not know who Wilson had called but could only relate that Wilson said that, "they did make an offer . . . [that] was less than a specific number." (Heard Dep. at 72.) ADM then revised its quotation to a number less than its original quote but slightly higher than the alleged Staley quote. (Heard Dep. at 72.) Heard did not recall any specific attempts to verify a price with American Maize. However, McLaughlin stated in his deposition that on two or three occasions over the years, Wilson had made references to being "in at big blue" or "finished at big red" but that he refused to discuss this and, in fact, called Andreas to complain about Wilson's behavior. (McLaughlin Dep. at 69.)

These sporadic comments over the course of a seven-year time period do not reveal any reciprocal exchange of pricing information among competitors or discussion of future prices. In fact, the incident involving Cargill reveals an express refusal to discuss pricing. Even the assertion that someone at Staley verified a price quote that had already been given to the Honickman Group is nonprobative of collusion, as Heard testified that ADM's response was to drop its price to be competitive in order to retain the business. *See Blomkest*, 203 F.3d at 1034 (finding evidence of price verifications non-probative where they involved a past quotation rather than future market prices, there was no evidence indicating that the verifications had an impact on price increases, and the record suggested that prices were possibly cut as a result of the verification.)

Plaintiffs then point to a calendar entry indicating that Andreas was having dinner with McLaughlin in Chicago, one occasion when Larry Cunningham, Staley's President from 1988 90, was introduced to Andreas by Staley's head of sweetener sales and marketing over lunch at the Decatur

Country Club, and one of McLaughlin's expense reports indicating that he had dinner with Wilson and several other individuals during a CRA meeting in November 1993. There is nothing about any of this evidence that indicates that pricing or customer allocation was discussed on any of those occasions, and the evidence is far too ambiguous to support such an inference. Plaintiffs have again seized upon these few instances of so-called opportunities to conspire and insinuated that price fixing must have been discussed at these social encounters, without a shred of evidence to support that conclusion.

Finally, Plaintiffs note the "inter-relations between the companies and close relationships between senior executives of the various companies." (Plaintiffs' Corrected Consolidated Opposition at 95.) Andreas stated that his family had been personal friends with the family of Pierre Callebaut, a member of Staley's Board of Directors. Plaintiffs also point to the fact that ADM had a 7.5% ownership interest in Tate & Lyle, Staley's parent corporation, owned nearly ⅓ of American Maize's Class A stock, and held 26.8% of American Maize's outstanding shares. Plaintiffs also offer that senior executives had the phone numbers of their competitors' senior executives on their rolodexes or in their telephone books.

Again, Plaintiffs have, at best, shown opportunities to conspire, followed by the bald conclusion that the relationships were significant or allowed ADM to influence a competitor's operations without demonstrating a single example of such influence. There is simply no evidence indicating either that ADM used its stock holdings to affect decisions concerning HFCS production or pricing or that Andreas and Callebaut discussed their respective company's pricing practices, even assuming that Callebaut was in a position to influence pric-

ing decisions, as Plaintiffs have conceded that at Staley, "all pricing authority for HFCS was Doxsie's responsibility or the responsibility of the President of the company." (Class Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶ 38.)[16] Nor can any reasonable inference be drawn from the fact that executives had other executives' phone numbers on their rolodexes, as there are several obvious and legitimate business reasons why they would have been in contact with each other; namely, to conduct CRA business or to arrange purchases/sales of product.

Thus, Plaintiffs have relied on inter-firm communications and opportunities to conspire which include trade association meetings and conventions, a minute number of meetings or social encounters between various executives over a lengthy period of time, the possibility of a relatively small number of price verification calls, and the bare fact that ADM owned a percentage of the stock of American Maize and Staley's parent organization. Similar, and arguably stronger, evidence was rejected in *Blomkest*, where the Eighth Circuit found "[t]he fundamental difficulty with the class's argument ... is that it assumes a conspiracy first, and then sets out to 'prove' it. However a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly." 203 F.3d at 1033. This observation is even more appropriate in the matter now before this Court.

"Where cooperation is necessary for a legitimate business purpose, the mere opportunity to conspire ... is insufficient to support an inference of conspiracy." *In re Citric Acid*, 996 F.Supp. at 959, *citing Wilcox v. First Interstate Bank of Oregon*, 815 F.2d 522, 527 (9th Cir.1987); *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d at 784 (noting

---

**16.** It is undisputed that no Defendant held an ownership interest in Cargill or CPC.

that "[c]ompetitors are permitted ... to engage in cooperative behavior, under trade association auspices or otherwise, provided they don't reduce competition among themselves"); *In re Baby Food Antitrust Litigation,* 166 F.3d at 133, *citing Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1242 (3rd Cir.1993) (concluding that evidence of opportunity is entitled to little weight and that "evidence of social contacts and telephone calls among representatives of the defendants was insufficient to exclude the possibility that the defendants acted independently.") Even after considering the record as a whole, the Court finds that the evidence of sporadic inter-firm communications/opportunities to conspire does not tend to exclude the possibility of independent action, as required to support a reasonable inference of collusion.

### C. *Exchange of Sensitive Information*

■ Plaintiffs also suggest that Defendants facilitated the conspiracy through the exchange of confidential information when Staley explored the acquisition of American Maize in 1989, CPC looked into a merger with American Maize in 1993 and 1995, and ADM purchased a 50% interest in Almex from Staley in 1993. They also note Staley's disclosure of dextrin production information and its Decatur plant costs, ADM's disclosure to American Maize of its grind capacity, Cargill's discussion with ADM regarding a corn wet milling plant in Bulgaria, American Maize's consultation with ADM regarding the planned expansion of its plant in Hammond, Indiana, and the fact that ADM acquired a copy of a Cargill's form of tolling agreement through McKeany–Flavell, an independent broker acting on behalf of Ocean Spray.

The portion of the deposition cited in support of Staley's exploration of acquiring American Maize does not establish that any information was exchanged between the two companies, let alone confidential information. (Steve Hines Dep. at 142–43.) When CPC toured American Maize with an eye toward a possible merger, CPC's representatives were shown but not given copies of data indicating the number of salaried positions, the number of hourly positions, year-end production data, and a breakdown of year-end manufacturing costs under a confidentiality agreement that limited CPC's use of the information. (Plaintiffs' Exhibits 472–474.) The documents cited by Plaintiffs do not make any reference to pricing or customer information. Plaintiffs have not demonstrated that any of the individuals from CPC who participated in the merger discussions had responsibility for HFCS pricing or customer sales and have ignored the fact that this information was shown (and not given) to the CPC representatives under the scope of the confidentiality agreement. Instead, they ask the Court to engage in what amounts to sheer speculation that this information was used anticompetitively and that the provisions of the confidentiality agreement were breached. Likewise, the documents cited in connection with the Almex joint venture are non-probative, as they have nothing to do with either pricing or customer allocation in the United States HFCS industry. To the extent that the word "price" even appears in the documents, Plaintiffs attempt to portray it as if it represents the United States HFCS industry, when it clearly referred to brainstorming sessions with respect to how the joint venture was to operate within the HFCS industry in Mexico.

The remainder of the alleged exchanges are equally non-probative for the same reasons. Staley and ADM exchanged some information with respect to the possibility of working together to reduce manufacturing costs for dextrin, a completely different product. Staley prepared proposed slides as part of "Project Storm"

that would have disclosed its corn wet milling costs for the Decatur plant to ADM; however, the documents cited do not confirm that these slides were ever actually shown to ADM but, rather, suggest that the presentation was not made. (John Phillips Dep. at 138.) ADM may have told American Maize's Vice President of Operations its plant grind capacity but did not discuss future capacity or finishing capacity. (Randolph Holme Dep. at 48, 67.) Cargill's Micek and ADM's Andreas discussed the possibility of jointly operating a corn wet milling facility in Bulgaria, and ADM and American Maize toured each other's plants in connection with ADM's advising American Maize on the planned expansion of American Maize's Hammond, Indiana, plant, which did not manufacture HFCS. ADM acquired a copy of Cargill's form of tolling agreement with Ocean Spray from McKeany–Flavell, the broker who represented Ocean Spray in purchasing negotiations.

### D. *Alleged Refusals to Supply or Lower Prices*

Plaintiffs also take issue with a handful of situations where a HFCS producer declined to cut its price in exchange for the opportunity to supply a greater volume of product to a customer. The first example is a situation that occurred in the second quarter of 1989, when ADM refused to sell to Pepsi after Pepsi attempted to negotiate a price reduction. The two companies had a letter of intent which Pepsi believed to be binding, while ADM considered there to have been no acceptance and sought further negotiation. (James Kozlowski Dep. at 71.) The dispute was ultimately resolved by a discussion between Pepsi's Chairman and ADM's Chairman, and ADM resumed its deliveries to Pepsi. (Kozlowski Dep. at 72.) There is no indication in this testimony or any of the other cited evidence indicating that a request was made of any other

supplier to pick up the slack or that there was any refusal to supply by any other supplier during this period.

Plaintiffs next offer an incident in 1991 when Pepsi decided not to use ADM as a supplier for HFCS 55 and Staley refused to supply additional HFCS 55 to Pepsi despite the fact that it was operating at 80% capacity at that time. Nicholas Guarino, the Manager/Director of Sweeteners for Pepsi, stated that when the shortage hit, he spoke with unnamed HFCS 55 suppliers in an attempt to get more product; he does not state that he specifically spoke to Staley or that Staley refused to respond to his request. (Guarino Dep. at 29.) James Kozlowski, Pepsi's Vice President of Development and Procurement, then testified in his deposition that Pepsi lacked adequate sweetener supply "as a result of surging that it was doing in its business" and turned to third-party operators to fill the gap. (Kozlowski Dep. at 72.) These third-party operators, who are identified only as "ADM-delivered distributors," were instructed by ADM not to sell to Pepsi. *Id.* While the precise identity of these third parties is not revealed in the record, it seems obvious that the other Defendants in this action are not "ADM-delivered distributors." Thus, the evidence identified by Plaintiffs simply does not stand for the proposition asserted.

Plaintiffs also reference Staley's refusal to supply Pepsi in 1992 after Pepsi asked Staley, as its largest supplier, to reduce the price of HFCS 55 for the same volume or reduce its volume for the same price. Staley gave Pepsi the ultimatum that it had to take all that Staley wanted to sell at the same price or nothing at all. (Guarino Dep. at 157–58.) When Pepsi declined this offer, Staley walked away from Pepsi's business for 1992, thinking that Pepsi would be unable to replace the lost volume with other producers and would have to

come back to Staley. (Guarino Dep. at 159.) However, the record reveals that Pepsi was then able to replace the lost volume of HFCS 55 from Staley's competitors; namely, American Maize and Cargill, who then agreed to supply the HFCS at prices below those that had been offered by Staley. Contrary to Plaintiffs' suggestion, this is the essence of competition. When one supplier refused to drop its price, its competitors came in with lower offers and took the business.

Plaintiffs then turn to HFCS negotiations for 1994 and make the generalized statement that there "were almost no deviations from list price." Once again, the evidentiary support for this conclusion is woefully inadequate. The identified section of the deposition of Cindi Chepokas, Cargill's Sales Department Marketing Assistant, does not confirm that there were no deviations from list price in 1994 negotiations; to the contrary, she stated that very few customers paid list price. (Chepokas Dep. at 134.) Peter Blaydes, a Cargill salesman who had just started in 1993, testified that he had sold HFCS to customers at list price but had also had occasion to deviate from that price during negotiations. (Blaydes Dep. at 39.) He then commented that in 1993, he had almost no deviations from list price but then clarified that he did not have to deviate because his customers were willing to pay Cargill's list price because Cargill had set the pricing floor for HFCS. (Blaydes Dep. at 40–41.)

Around that time, Plaintiffs assert that "no producer responded to a written request from Pepsi General Bottlers to provide more volume in return for lower prices." (Plaintiffs' Corrected Consolidated Opposition at 49.) However, this on its face is yet another example of producers in a concentrated market independently making a decision to preserve margins, and Plaintiffs have produced no other evidence

which would tend to exclude this possibility.

The fact that Cargill did not quote HFCS pricing to Coca–Cola Bottlers Association that fall and declined business from Heilemann is likewise insufficient to support the inference of collusion, as is the assertion that no other producer tried to take away Cargill's business at Swiss Valley. Plaintiffs also note Coca–Cola's frustration in its attempts to shift volume during this time and the resultant perception of a coordination among the suppliers in their disinclination to budge very far from the list price. Defendants have responded that the contract negotiations for 1994 came in the wake of the flood in the midwest during the summer of 1993 that decimated the corn crop and closed down one producer's plant in Iowa and, because of the risk involved with the reduced corn crop, they were unwilling to take on any additional risk. Again, Plaintiffs' evidence does not tend to exclude the possibility that HFCS suppliers were pursuing their independent interests by protecting as much of their margins as they could in the uncertain market.

In summary, Plaintiffs have focused on an infinitesimally small number of transactions in the universe of supply agreements that transpired during the alleged conspiracy period and attempted to cast them in the light of conspiratorial refusals to supply in order to maintain pricing or customer allocation agreements. Aside from the fact that many of the examples offered simply do not support the proposition asserted, Plaintiffs fail to rebut the established maxim in concentrated, oligopolistic markets that it can be in a supplier's independent interest to refuse to cut prices, thereby maximizing profits for all as "[t]he logical outcome of the price-cutting that [Plaintiff] advocates would be static market shares for the producers and reduced

profit margins." *Reserve Supply,* 971 F.2d at 52–53. The fact that Defendants made a business decision not to drop their prices "does not suggest that they 'acted in a way that, but for a hypothesis of joint action, would not be in [their] own interest.' " *Id.* at 53, *citing Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 726 (7th Cir.1986.)

This conclusion is further supported by other evidence of record. An internal Cargill document reveals its strategies for pursuing ADM accounts with the desire to obtain the business without triggering a retaliatory price cut by ADM. (Defendants' Joint Appendix at 81.) The testimony of ADM's Vice President for Sweeteners indicated that ADM had the same philosophy. (Cremers Dep. at 84.) In fact, ADM's Ted Keitzman stated that in trying to obtain business from an account that was historically supplied by Cargill, he would try to quote a price that would keep the customer from running back to Cargill with the quote. (Keitzman Dep. at 66.) Staley's Vice President of Sweetener Sales/National Accounts indicated that as a result of its higher cost structure, Staley was not interested in reducing prices to obtain new business. (Bosak Dep. at 68–69.)

### E. *Inter–Defendant Sales*

■■■ A central theme in Plaintiffs' conspiracy theory is that, like the lysine conspiracy, any Defendant who had gained market share at another conspirator's expense had to "balance the deal" the following year by purchasing HFCS from the co-conspirator that suffered the loss. In support of this theory, Plaintiffs have identified Cargill's purchases from ADM and Staley in 1990, Cargill's 1991 purchases from ADM, ADM's purchases from Staley in 1992 and 1993, and Staley's 1995 purchases from ADM and Cargill. Although each of these transactions will be discussed in turn, the Court notes the glaring omission of any purchases by CPC or American Maize despite the fact that CPC gained market share in 1988 and from 1990–93 and lost market share in 1994–95, and American Maize gained market share in 1988 and from 1990–92 and lost market share in 1993–94.

In 1990, Cargill purchased HFCS from ADM and Staley, which represented 2.78% of Cargill's total sales for the year. Plaintiffs suggest that these purchases were to compensate for the fact that Cargill's market share increased by approximately 1.5% that year, while ADM's and Staley's shares decreased by 1.7% and 2.1% respectively. However, this hypothesis ignores the fact that CPC and American Maize also lost their market shares that year, with CPC's market share decreasing by .5% and American Maize losing .2%. Plaintiffs have identified no purchases from either CPC or American Maize to compensate for their loss in market share.

Similarly, in 1991, Cargill again made purchases from ADM, which Plaintiffs contend was to "balance the deal." The record demonstrates that Cargill expanded its share of the industry that year by approximately 2.1%, while ADM's share decreased by .7%. Plaintiffs fail to identify or explain the conspicuous absence of purchases from Staley, which lost .3% of its share, or purchases by either CPC or American Maize, both of which increased their market shares by .6% during this period.

ADM made purchases from Staley in 1992, which were purportedly to compensate Staley for refusing to supply Pepsi. However, these purchases do not fit into Plaintiffs' prescribed pattern for how unauthorized shifts in market share are to be reconciled within the conspiracy. With the other purchases to "balance the deal", Plaintiffs look to the change in market share at the end of the previous year as an indicator of which producer gained market share and therefore needed to make pur-

chases during the next year from those who had lost market share. That would mean looking to the market shares as of the end of 1991, when ADM *lost* 2.9%, CPC gained .1%, Cargill *gained* 1.8%, American Maize gained .8%, and Staley lost .2%. Thus, under Plaintiffs' theory, Cargill and American Maize should have been buying from ADM.

Plaintiffs also point to ADM's purchases from Staley in 1993. The record indicates that ADM increased its market share by 3% that year, while Staley lost roughly 4% of its market share. Nevertheless, they identify no purchases by CPC, which gained .6% that year or by Cargill, which gained .2%.

Likewise, Plaintiffs rely on purchases made by Staley from ADM and Cargill in 1995 as further evidence of "balancing the deal." During the relevant time period, Staley's market share increased by approximately 1%, and ADM's market share decreased by .2%. However, Cargill actually *increased* its market share by .1%, while CPC and American Maize's market shares *decreased* by .8% and .4% respectively. Accordingly, it would appear that there was no need for Staley to "balance the deal" with Cargill; rather, under Plaintiffs' theory, there should have been purchases from CPC and American Maize.

Significantly, Plaintiffs have identified no purchases to balance the deal in the following time periods, when their conspiracy theory would seem to have required such transactions: (1) as of the end of 1988, Staley had lost 1.3% of its market share while ADM's increased by .5%, CPC's increased by .5%, and American Maize's increased by .6%, which should have resulted in identifiable purchases by ADM, CPC, and American Maize in 1999, and (2) as of the end of 1993, Staley had gained 2.9% market share and ADM had

gained .3%; as Cargill lost 1% market share and American Maize lost .5% market share, there should have been purchases by Staley and ADM from Cargill and American Maize in 1994 to "balance the deal."

Aside from the failure to identify the additional purchases that would have been necessary to complete the suggested pattern, the record reveals that the inter-Defendant purchases of HFCS that have been identified were of a much smaller magnitude than would have been required to "balance the deal" for the amount of market share that was gained or lost in each instance. Cargill purchased only 843,208 cwt.[17] from ADM and Staley in 1990 when purchases totaling 1,851,440 cwt. would have been required to fully compensate for its gain in market share. Likewise, in 1991, Cargill purchased 258,810 cwt., when purchases of nearly 4.5 million cwt. would have been required to "balance the deal." It would have been necessary for Staley to have purchased 1,573,196 cwt. in 1995 in order to fully compensate for its gain in market share, but it purchased only 302,159 cwt. from other Defendants that year.

Once again, Plaintiffs have assumed the existence of a conspiracy and attempted to contort the evidence to support their presumption. However, as illustrated above, the evidence simply does not fit the mold in this case, and the glaring omissions in the pattern hypothesized by the Plaintiffs are telling. Although this alleged conspiracy supposedly functioned like the lysine and citric acid conspiracies, the Court has already concluded that Plaintiffs have failed to prove that HFCS producers had a comparable mechanism to facilitate the crucial sharing of individual sales and production data. Moreover, the citric acid scheme operated by allotting market

---

17. Cwt. is the abbreviation for hundred- weight, which is equivalent to 100 pounds.

shares to within ⅒ of 1%. Assuming that the HFCS producers agreed to this same or some similar margin, the data set forth above undermines rather than supports Plaintiffs' theory.

Plaintiffs attempt to salvage their argument by asserting that in the five identified instances, the purchases made were for prices in excess of the buyer's costs and the producer had excess production capacity. This assumes that at the time of each purchase, the buyer could have readily shifted its finishing capacity to produce the additional quantity of HFCS and that its capacity was not being utilized in some other respect, neither of which has been established in this case; to the contrary, Plaintiffs have conceded that the percentage of total finishing capacity used to make HFCS (capacity utilization) fluctuates throughout the year for several reasons, including seasonal variation in demand for products containing HFCS, routine plant maintenance, and storage of product in inventory. Furthermore, the handful of identified transactions out of the thousands of transactions that were consummated over the course of the conspiracy period represents cherry-picking of bumper crop proportions and does not evidence purchases of sufficient magnitude to come close to "balancing the deal" for gains in market share. Such a showing does not tend to exclude the possibility that Defendants acted independently or that the inference of conspiracy to fix prices is reasonable in light of the competing inference of independent action.

### F. Cheating

■ ADM and Cargill periodically paid rebates to customers in separate transactions that were not shown on their invoices. Plaintiffs contend that this is evidence of their secret attempts to cheat on the price fixing agreement. However, ADM's Bohr testified that ADM issued rebate checks separately from the invoices at the customer's request and that the rebate was sometimes reflected in the contract request forms. (Bohr Dep. at 38, 40.) Although Plaintiffs cite to Bohr's testimony for the proposition that there were no entries on the computer for the rebates, his actual testimony was that he didn't know whether there were or weren't computer entries for this information. (Bohr Dep. at 40.) Such a showing does not tend to exclude the possibility that the Defendants were pursuing their independent interests.

### G. Discouragement of New Entrants

■ The cost of setting up a corn wet milling plant and the fact that existing producers were expanding their capacities allegedly served as barriers to the entry of new participants in the HFCS market.[18] Plaintiffs then cite several attempts by HFCS suppliers to discourage new companies from joining the HFCS market or to enter into joint ventures with existing suppliers. Despite their effort to cast these attempts in an ominous light, there is nothing about this evidence that tends to exclude the possibility of independent action or the pursuit of legitimate, independent interests.

### H. Opinions of Lower–Level Employees and Customers

■ Plaintiffs then offer the statement of ADM's Vice President for Sweeteners that between five and ten times over the years, ADM would quote prices at Wilson's

---

18. Cargill spent a substantial sum of money in order to construct and open a new corn wet milling plant in Blair, Nebraska, in 1995. It would seem nonsensical for Cargill to have undertaken such a great expenditure if it had agreed not exceed a specific market share that was not increasing as fast as the producers' expanding capacities.

direction that its salesmen knew were too high to obtain the customer's business. (Cremers Dep. at 62, 81–82.) He also states that Wilson avoided aggressively going after the business of ADM's competitors in order to increase the profit on HFCS sales and prevent market prices from collapsing as a result of a retaliatory price war. (Cremers Dep. at 81–83.) ADM's Vice President of Sales and Marketing testified that ADM adopted a policy of maximizing its profit margins even at the risk of losing market share by refusing to price aggressively to pick up additional business. (Heard Dep. at 63–64.) Staley wanted to preserve price stability and avoid disrupting the market. Similarly, Cargill and American Maize refrained from pursuing other producers' accounts in order to be non-disruptive or trigger a volume market share war. Plaintiffs also note various statements of frustration by certain buyers in the HFCS industry at being unable to obtain lower prices for greater volumes of business or at not receiving competitive pricing from Defendants with more geographically convenient plants.

This is nothing more than Plaintiffs' oft-repeated argument that there must be something inherently anti-competitive about a producer's determination to preserve margins at the risk of selling less volume that the Court has rejected time and again in this Order. For the reasons set forth above, such a suggestion is equally unavailing in this context.

Although the conduct evidence is quite voluminous, quantity is not a substitute for quality. See In re Potash Antitrust Litigation, 954 F.Supp. at 1353 (noting that "[g]iven the sheer volume of this submission, as expanded by the Plaintiffs' recitation of pertinent depositional testimony, there is an instinctive, natural inclination to presume that such a daunting collection of documents must, a fortiori, generate triable issues of fact. Our review, however, has convincingly persuaded us otherwise.") In order for Plaintiffs to survive at this stage of the litigation, the Court must be able to reach the conclusion that the evidence of record and any inferences reasonably drawn therefrom would be sufficient to allow a reasonable jury to conclude that Defendants participated in an illegal price fixing conspiracy in the HFCS market. While some of the evidence identified by Plaintiffs could promote an inference that the nature of the HFCS market was conducive to conspiracy or that certain practices could be consistent with collusive activity, they have, at best, shown conduct as consistent with permissible competition as with illegal conspiracy. See Matsushita, 475 U.S. at 588, 106 S.Ct. 1348; In re Brand Name Prescription Drugs Antitrust Litigation, 186 F.3d at 787–88. The conduct evidence is therefore ambiguous as a matter of law and fails to support the substantial inferences that the Plaintiff class needs to draw in order to meet its burden. Rather, in order to reach the characterization favored by Plaintiffs, a jury would have to not only disbelieve Defendants' legitimate business explanations but also make additional assumptions that are simply not reasonable based on the record in this case. The Court is therefore comfortable in reaching the conclusion that when the conduct evidence is considered as a whole and all *reasonable* inferences are drawn in their favor, Plaintiffs have failed to meet their burden of offering evidence that "tends to exclude the possibility that the alleged conspirators acted independently." See Matsushita, 475 U.S. at 588, 106 S.Ct. 1348.

However, as the Seventh Circuit has noted, where there is no direct evidence in support of an alleged conspiracy, a plaintiff can meet its burden to survive summary judgment by setting forth "*economic* evidence that would show that the hypothesis

of collusive action was more plausible than that of individual action." *In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d at 787 (emphasis added.) Therefore, the Court now turns to an examination of the economic evidence of record.

## II. ECONOMIC EVIDENCE

### A. *Rausser Report*

 The primary economic evidence presented by the Plaintiff class is the expert report of Dr. Gordon Rausser ("Rausser"). After analyzing the market for sales of HFCS in the continental United States for the alleged conspiracy period, Dr. Rausser reached essentially five main conclusions:

(i) the structure of the HFCS industry makes a conspiracy as alleged by the Class Plaintiffs economically plausible; (ii) the defendants engaged in several business practices that facilitated a conspiracy as alleged by the Class Plaintiffs; (iii) the defendants' behavior was inconsistent with their unilateral economic self-interest and indicative of a conspiracy as alleged by the Class Plaintiffs; (iv) HFCS prices were higher during the period of the alleged conspiracy than either before or after this period, even after controlling for changes in supply and demand factors between the conspiracy period and the nonconspiracy periods; and (v) the increase in HFCS prices was common to the Class Plaintiffs.

(Rausser Report at 2.)

### 1. *Structure of HFCS Industry*

Dr. Rausser considered the fact that HFCS is a commodity product, which means that the product as offered by different suppliers is perceived to be the same or homogeneous and purchasing decisions are generally based on price. (Rausser Report at 5–6.) Although other sweeteners are available in the market-

place, they do not provide viable functional or economic alternatives to HFCS, and consumers would not likely switch to these other sweeteners in response to a price increase. *Id.* at 4. Demand for HFCS is relatively inelastic; HFCS costs are a relatively small percentage of the overall cost of the goods in which it is used, so an increase in HFCS prices would not translate into a similar increase in the price of those goods, and demand is such that a price increase would not cause the quantity of HFCS sold to change significantly. *Id.* at 6–7. The HFCS industry is a highly concentrated oligopoly in which there is insufficient supply available from other producers to defeat a price increase. *Id.* at 7. The time and expense required to enter the HFCS industry even on a small level are somewhat prohibitive, particularly when existing producers maintain excess production capacity. *Id.* at 8–10. Finally, Dr. Rausser noted that the structure of the HFCS market appeared to be similar to the lysine and citric acid markets, in which ADM has pled guilty to antitrust violations. *Id.* at 13–14. From these observations, Dr. Rausser concluded that a HFCS conspiracy was economically plausible.

### 2. *Practices in the HFCS Industry*

Dr. Rausser then opined that certain industry practices would have facilitated the formation and maintenance of a conspiracy. For example, Defendants published price lists in advance of their effective date, which provided an opportunity to coordinate pricing. *Id.* at 14. HCFS was routinely priced on a zone-delivered basis, where all customers in a defined region were charged the same price regardless of their location within that region. *Id.* at 16. Dr. Rausser also made much of the suggestion that information from the CRA

was used to monitor market shares.[19] *Id.* at 16–17. There is a degree of cross-ownership and joint development in the market, allowing one Defendant to influence the business decisions of another Defendant, and regular communication among high-level executives. *Id.* at 17–18. Finally, Dr. Rausser's regression analysis indicated that there was an average overcharge of 15.7% during the conspiracy period after controlling for other non-collusion variables. *Id.*

### 3. *Pursuit of Unilateral Self–Interest*

Defendants uniformly began setting list prices for HFCS 42 at 90% of the price for HFCS 55 when there had previously been no consistent relationship between the two prices. *Id.* at 19–20. Dr. Rausser found excess production capacity throughout the conspiracy period and purchases among Defendants at times when the purchaser was allegedly not utilizing all of its own production capacity. *Id.* at 21–22. He then noted a handful of instances where Defendants refused to lower prices in order to obtain increased volumes from large customers. *Id.* at 23. On occasion, Defendants also allegedly confirmed prices being offered to particular customers. *Id.* at 25. These practices, according to Dr. Rausser, are inconsistent with HFCS producers acting in their unilateral self-interest because each producer should have made an effort to sell all of the product that they could regardless of the fact that they would have to drop their price and thereby reduce their profit margins in order to do so.

### 4. *Class–Wide Impact*

Dr. Rausser opined that HFCS transaction prices are correlated with list prices, as the negotiation of prices generally used the published list price as a benchmark.

*Id.* at 26–27. He then found that the price of HFCS when procured under a tolling agreement had a statistically significant correlation with the price when procured under a fixed-price contract. *Id.* at 27. Based on his statistical analysis, Dr. Rausser also concluded that transaction prices during the conspiracy period were higher than either before or after the period, considering relevant supply and demand factors and that the prices and profit margins on average were higher than they otherwise should have been. *Id.* at 28. The implication, according to Dr. Rausser, is that any action affecting the price of HFCS to some customers would have the same impact on other customers and is consistent with the existence of a conspiracy to raise prices during the alleged conspiracy period. *Id.*

### B. *Leitzinger Report*

The Plaintiff class also relies on the expert report of Dr. Jeffrey Leitzinger ("Leitzinger"). Dr. Leitzinger used the same factual assumptions and looked to many of the same factors identified by Dr. Rausser in reaching his ultimate conclusion that the prices for HFCS during the 1989–1995 period were inflated by collusive behavior. (Leitzinger Report at 2–5.) Specifically, he concluded that: (1) the HFCS market provided incentive for collusion; (2) the combination of high concentration, ready availability and comparability of price information, ongoing market share data, and cross-ownership gave Defendants the ability to detect cheating behavior; (3) the meetings among executives created ample opportunity to coordinate pricing decisions; (4) the pattern of conduct is difficult to explain as rational self-interest except by reference to collusive

---

**19.** However, as it is undisputed that Defendants received only aggregate data from the CRA, this particular suggestion is not proba-

tive of the point asserted and is entitled to little, if any, weight.

agreement; and (5) during the conspiracy period, the gap between prices and marginal costs increased. *Id.* at 5–6. He also found that the average net margin for American Maize, ADM, and Staley were higher during the conspiracy period than either before or after the period and that the increase could not be explained by decreases in the amount of market-wide excess capacity. *Id.* at 5.

### C. *Other Economic Evidence*

In addition to the expert opinions of Drs. Rausser and Leitzinger, the Class Plaintiffs cite other evidence they believe tips the balance in their favor. They offer a Jacoby index calculation, which indicates that the relative market shares of the Defendants remained relatively "stable" from 1989 through 1995. (Class Plaintiffs' Corrected Consolidated Opposition at 60–61.) Additionally, pricing in the HFCS industry was based on a readily-calculable formula starting from the Midwest zone-delivered price for HFCS 55, and this formula did not vary during the conspiracy period, which enabled suppliers to calculate their competitors' prices from the published list prices. *Id.* at 64–65. The negotiated processing fee in tolling agreements somewhat corresponds to the negotiated price in a non-tolling agreement and can be compared by customers. *Id.* at 65–66. Plaintiffs contend that this indicates an ability to fix prices even where tolling agreements were made pursuant to individual negotiations.[20]

In attempting to meet their burden, Plaintiffs have again relied largely on evidence of conscious parallelism and other conduct that is not probative of collusion as a matter or law, as well as comparisons to other acts of price fixing in different markets by former ADM employees. If there is in fact a demonstrable correlation between the negotiated processing fee in tolling agreements and the negotiated price in non-tolling sales, this is nothing more than another opportunity to conspire or circumstance that could possibly facilitate collusive behavior that lacks the additional support necessary to tip the scales and promote the inference of conspiratorial activity.

Plaintiffs point to the existence of a "readily calculable formula" for pricing HFCS 55 throughout the alleged conspiracy. However, "[t]he fact that a standard product is priced according to a standard formula does not indicate that a conspiracy exists; one manufacturer could have implemented the pricing system, and its competitors could have decided to independently adopt it"; the result would then be yet another example of conscious parallelism. *Reserve Supply*, 971 F.2d at 53.

The citation to the Jacoby index calculation, indicating that the relative market shares of the Defendants remained relatively "stable" from 1989 through 1995 and could be indicative of collusion is equally unavailing. While the Jacoby index considers coefficients of variation in a range of 7 to 15% to be normal, the raw indices for the various Defendants in this case ranged from 4.39% to 8.29%.[21] Furthermore, as discussed above in connection with the inter-Defendant purchases, there were in fact shifts in market share of up to 4%

---

**20.** In this section, Plaintiffs also surmise that the various attempts by larger Defendants to explore either acquisition or joint ventures with smaller Defendants provided opportunities for the exchange of confidential information, which was discussed above as purported conduct evidence. *Id.* at 71–72.

**21.** Specifically, the Jacoby index was 4.39% for ADM, 5.13% for Cargill, 5.7% for CPC, 6.11% for American Maize, and 8.29% for Staley. After considering the much-touted inter-Defendant purchases, the values were still only 4.39% for ADM, 5.36% for Cargill, 5.68% for CPC, 6.10% for American Maize, and 6.84% for Staley.

during the time of the alleged collusion. Under Plaintiffs' conspiracy theory, the HFCS market served as the pattern for the lysine and citric acid conspiracies, where volumes were strictly allocated and monitored to within .1%. As such, volume swings of up to 4% would appear to be inconsistent with Plaintiffs' theory of the case. In light of this evidence, as well as the fact that Staley had an essentially normal index value, the Jacoby index calculation does not tend to exclude the possibility of independent action, as required to support a reasonable inference of collusion.

The economic experts essentially base their conclusions of economic plausibility on their examination of this very weak circumstantial evidence and the assumption of inferences that the Court has found to be not reasonably supported by the record. The experts' reliance on evidence that is not probative of collusion as a matter of law in drawing a conclusion that the record is consistent with conspiracy or that a conspiracy would be economically plausible simply does not tip the balance in favor of the Plaintiff class or demonstrate that a hypothesis of collusion is more plausible than a hypothesis of individual action.

In *Blomkest*, the United States District Court for the District of Minnesota and the Eighth Circuit examined a strikingly-similar expert opinion by Dr. Rausser which was submitted in support of the plaintiffs' conspiracy theory in that case. In that case, Dr. Rausser looked at comparable (and arguably stronger) types of evidence and developed econometric models which purported to prove that the price of the commodity in that case would have been substantially lower in the absence of collusion. *Blomkest*, 203 F.3d at 1033. Specifically, he opined:

> [T]he structure of the industry is conducive to the formation of a price fixing conspiracy ... certain of the Defendants' actions were inconsistent with in-

dividually rational, and economically maximizing, behavior ... and [according to his statistical model] the prices that were existent, during the conspiracy, exceeded the prices that had been forecasted in the model, by an average of 35 percent.

*In re Potash Antitrust Litigation*, 954 F.Supp. at 1346.

In the district court, Judge Kyle concluded that Dr. Rausser's arguments were unavailing because they were in part premised on the theory that "the size of the price increase, in and of itself, supports the inference of a conspiracy" and "required a factfinder to infer irrationality from the decision of low-cost producers to sacrifice market share for higher product prices." *Id.* at 1357, 1363. After concluding that the proffered conduct evidence of price fixing was insufficient as a matter of law, the court went on to find that the plaintiffs' case did not gain additional substance from Dr. Rausser's expert opinion:

> [H]is opinions can be no more reliable than the factual underpinnings upon which they have been predicated. With modest exception, the mere passage of an untrustworthy evidentiary showing, through the mechanism of an expert's Report, will be wholly unavailing in curing the foundational deficiencies. In voicing his opinions, Dr. Rausser has necessarily accepted, as reasonable, the ambiguous showings that *Matsushita* regards as nonprobative. We may not do likewise.

*Id.* at 1389 (internal citations omitted.)

In affirming the district court, the Eighth Circuit found Dr. Rausser's opinion to be "not probative of collusion" because it failed to take certain facts into consideration and relied "almost exclusively on evidence (such as the producers' common membership in trade associations and their publication of price lists to customers) that

is not probative of collusion as a matter of law." *Id.* at 1038. Under Federal Rule of Evidence 703, there must be "sufficient facts already in evidence or disclosed by the witness as a result of his or her investigation to take such expert opinion testimony out of the realm of guesswork and speculation." *Id.,citing Hurst v. United States,* 882 F.2d 306, 311 (8th Cir.1989). The court then concluded that Dr. Rausser's "heavy (if not exclusive)" reliance on evidence that was not probative of conspiracy rendered his model "fundamentally unreliable". *Blomkest,* 203 F.3d at 1038.

The Court finds this analysis equally applicable to this case. Dr. Rausser examined similar types of conduct evidence, made the same types of unreasonable assumptions, performed what appears to be the same type of econometric analysis, and arrived at strikingly similar findings and conclusions. Dr. Leitzinger's opinion, which was based on Dr. Rausser's findings of fact, is similarly flawed and non-probative for the same reasons. Thus, Plaintiffs' experts add nothing of value to the deficient conduct evidence.

III. SUMMARY

As set forth in great detail above, no single piece of evidence tends to exclude the possibility of independent action. Even when viewing the totality of Plaintiffs' evidentiary showings, the evidence does not tend to exclude the possibility that the Defendants were pursuing their legitimate independent interests; "that composite view can claim no synergistic enhancement 'from a number of acts none of which' tend to exclude the real possibility of independent action." *In re Potash Antitrust Litigation,* 954 F.Supp. at 1389. In the words of a respected colleague in the United States District Court for the Northern District of Illinois, "it requires no sophistication in mathematical theory to recognize that zero plus zero still equals zero[;] ... [i]f no incident has probative value, all incidents taken together have no probative value." *American Floral Services v. Florists' Transworld Delivery,* 633 F.Supp. 201, 215 n. 23 (N.D.Ill.1986). As this is precisely the case with the record now before the Court, Plaintiffs' case is insufficient to allow a reasonable inference that Plaintiffs' hypothesis of collusive action is "more plausible than that of individual action." *See In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d at 787.

This is not a conclusion that the Court has reached lightly. To the contrary, the Court is fully cognizant of the enormity of what is at stake for both Plaintiffs and Defendants and has spent more than two months delving through the voluminous record submitted in connection with the present motions. Over the six years that this matter has been pending in this forum, the Court has afforded Plaintiffs every opportunity to fully develop their evidentiary presentation, including staying this matter for a considerable period of time based on their representations that the evidence contained in the DOJ materials was crucial to their case. Despite these opportunities and their exhaustive best efforts, Plaintiffs have simply failed to uncover sufficient facts to adequately support their allegations of a seven-year, multi-billion dollar antitrust conspiracy in the HFCS industry. As Plaintiffs have therefore failed to present a genuine issue of material fact requiring resolution by a jury, and no reasonable jury could find in their favor on the record presented in this case without resorting to pure speculation or conjecture, summary judgment is appropriately entered in favor of Defendants.

CONCLUSION

For the reasons set forth above, Cargill's Motion for Summary Judgment [# 630] is GRANTED; A.E. Staley's Mo-

tion for Summary Judgment [# 632] is GRANTED; American Maize's Motion for Summary Judgment [# 650] is GRANTED; and Archer Daniels Midland's Motion for Summary Judgment [# 652] is GRANTED. The Court will contact the parties in the near future to schedule a telephonic status hearing, during which the disposition of funds remaining in the CPC settlement fund and the briefing schedule for the *Gray & Co.* case will be discussed.